Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 14, 2003        Decided June 20, 2003

No. 02-5069

AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS AND
DNC SERVICES CORPORATION, DEMOCRATIC
NATIONAL COMMITTEE,
APPELLEES

v.

FEDERAL ELECTION COMMISSION,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01522)

———

*David B. Kolker*, Attorney, Federal Election Commission, argued the cause for appellant. With him on the briefs was *Richard B. Bader*, Associate General Counsel.

*Trevor Potter, Lisa J. Danetz* and *Lawrence M. Noble* were on the brief for *amicus curiae* Campaign and Media Legal Center, et al. in support of appellant.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Laurence E. Gold* argued the cause for appellees. With him on the brief were *Joseph E. Sandler* and *Michael B. Trister.*

*James Bopp, Jr.* and *Raeanna S. Moore* were on the brief for *amicus curiae* James Madison Center for Free Speech in support of appellees.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: Unique among federal administrative agencies, the Federal Election Commission has as its sole purpose the regulation of core constitutionally protected activity—"the behavior of individuals and groups only insofar as they act, speak and associate for political purposes." *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 387 (D.C. Cir. 1981). As a result, Commission investigations into alleged election law violations frequently involve subpoenaing materials of a "delicate nature ... represent[ing] the very heart of the organism which the first amendment was intended to nurture and protect: political expression and association concerning federal elections and officeholding." *Id.* at 388. At the close of such investigations, a Commission regulation has long required public release of all investigatory file materials not exempted by the Freedom of Information Act. In this case, the subjects of a now-closed investigation challenge the regulation as inconsistent with both the Federal Election Campaign Act and the First Amendment. We hold that the regulation, though not contrary to the plain language of the statute, is nevertheless impermissible because it fails to account for the substantial First Amendment interests implicated in releasing political groups' strategic documents and other internal materials.

## I.

The Federal Election Commission's administrative enforcement procedures are governed by 2 U.S.C. § 437g(a) of the

Federal Election Campaign Act (FECA). When the Commission receives a sworn complaint alleging that an election law violation has occurred, it must first notify the alleged violator and give it an opportunity to respond to the accusation. If four Commission members find "reason to believe" that the respondent has committed or is about to commit a violation, the Commission must proceed with an investigation. 2 U.S.C. § 437g(a)(1), (2). If the Commission then finds "probable cause" to believe that a violation has occurred, it must attempt to reach an informal conciliation agreement with the respondent. *Id.* § 437g(a)(4)(A)(i). The Commission may bring a civil enforcement proceeding in U.S. District Court if conciliation negotiations fail. *Id.* § 437g(a)(6). Where the Commission decides to dismiss a complaint at any stage of the process, however, the statute allows "aggrieved" parties to challenge the dismissal in U.S. District Court. *Id.* § 437g(a)(8).

Two parts of section 437g(a) directly address confidentiality and disclosure of enforcement-related information. Subsection (a)(12)(A)—the provision at issue in this case—states that "[a]ny notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made." *Id.* § 437g(a)(12)(A). Subsection (a)(4)(B) addresses disclosures in post-investigation proceedings:

> (i) No action by the Commission or any person, and no information derived, in connection with any conciliation attempt by the Commission . . . may be made public by the Commission without the written consent of the respondent and the Commission.

> (ii) If a conciliation agreement is agreed upon by the Commission and the respondent, the Commission shall make public any conciliation agreement signed by both the Commission and the respondent. If the Commission makes a determination that a person has not violated . . .

[election laws], the Commission shall make public such determination.

*Id.* § 437g(a)(4)(B).

The Commission promulgated two regulations implementing these provisions, 11 C.F.R. §§ 111.20, 111.21, plus a third that reconciles FECA with the Freedom of Information Act, 5 U.S.C. § 552. The latter regulation, 11 C.F.R. § 5.4(a)(4), requires the disclosure of investigatory file materials in closed cases:

> Opinions of Commissioners rendered in enforcement cases and General Counsel's Reports and non-exempt 2 U.S.C. 437g investigatory materials shall be placed on the public record of the Agency no later than 30 days from the date on which all respondents are notified that the Commission has voted to close such an enforcement file.

11 C.F.R. § 5.4(a)(4).

The roots of this case reach back to the mid-1990s when the National Republican Senatorial Committee, the National Republican Congressional Committee, and an independent political action committee chaired by Oliver North filed eleven complaints with the Commission alleging, among other things, that the AFL-CIO and various individual unions had unlawfully coordinated their "Labor '96" campaign expenditures with political candidates and party committees. Finding "reason to believe" that FECA violations had occurred, the Commission embarked on a three-year investigation during which it subpoenaed approximately 50,000 pages of documents from the AFL-CIO, the Democratic National Committee (DNC), and 150 other respondents, as well as third-party witnesses. The AFL-CIO turned over documents containing detailed descriptions of meetings with elected officials, training programs for union activists, convention and get-out-the-vote activities, and polling data analyzing union members' political attitudes and the effectiveness of particular political messages. The DNC provided memoranda concerning internal deliberations between state and national party leaders, as well as "Coordinated Campaign" plans describing state offi-

cials' strategies, techniques, and timetables for winning up-coming elections across the country.

After the U.S. District Court for the District of Columbia issued a decision narrowing the circumstances under which the Commission could regulate coordination practices under FECA, *FEC v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999), the Commission dismissed the complaints in this case. At that time, Commission investigators had yet to review an estimated 10,000 to 20,000 pages of the materials gathered during the course of the proceedings. FEC General Counsel's Report, *In re AFL-CIO, et al.*, at 11 n.6 (June 12, 2000). None of the complainants sought judicial review of the dismissal under 2 U.S.C. § 437g(a)(8).

Pursuant to 11 C.F.R. § 5.4(a)(4), the Commission then redacted certain FOIA-exempt materials and made available an initial 6000 pages of investigatory files in its public records office. The AFL-CIO and DNC petitioned the Commission to withdraw the released files from the records office and to withhold virtually all remaining documents, arguing that the materials were protected by certain FOIA exemptions and by section 437g(a)(12)(A)'s prohibition against disclosing "[a]ny notification or investigation made under this section" without written consent of the respondent. According to the petitioners, disclosure of the materials would disadvantage them by revealing political tactics and strategies to their opponents and by needlessly releasing information identifying hundreds of officials, employees, and volunteers named in the documents, making it harder for the two organizations to recruit such personnel in the future. (Like the parties, we shall refer to the two petitioners as the AFL-CIO.) The Commission denied both the section 437g and FOIA claims.

The AFL-CIO then filed suit against the Commission in the U.S. District Court for the District of Columbia. Applying *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), the district court held that section 437g(a)(12)(A)'s plain language protects investigatory files from disclosure. *AFL-CIO v. FEC*, 177 F. Supp. 2d 48,

55–59 (D.D.C. 2001). The court also concluded that the Commission's position violated 11 C.F.R. § 111.21 and FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C). *AFL-CIO*, 177 F. Supp. 2d at 59–61.

The Commission appeals, arguing that its longstanding disclosure policy warrants *Chevron* deference. In support of the Commission, the Campaign and Media Legal Center, the Center for Responsive Politics, and the National Voting Rights Institute assert in their amicus brief that disclosure of investigatory files is essential to public oversight of the Commission. The AFL-CIO defends the district court's *Chevron* analysis and argues that even if FECA is ambiguous, the Commission deserves no deference because its interpretation raises serious First Amendment problems. Amplifying the latter point, the James Madison Center for Free Speech argues in its amicus brief that the Commission's policy creates an incentive for political groups to file complaints against their opponents in order to gain access to their strategic plans, as well as to chill the opponents' activities. We review the district court's grant of summary judgment de novo. *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 756 (D.C. Cir. 2003).

## II.

Because the Commission is charged with administering FECA, we analyze its regulations under the *Chevron* framework. *See, e.g.*, *Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 404 (D.C. Cir. 1996). As usual, we begin by asking whether Congress has spoken "directly . . . to the precise question at issue," since both we and the Commission must give effect to Congress's unambiguously expressed intent. *Chevron*, 467 U.S. at 842–43. We consider the provisions at issue in context, using traditional tools of statutory construction and legislative history. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). A statute is considered ambiguous if it can be read more than one way. *United States v. Nofziger*, 878 F.2d 442, 446–47 (D.C. Cir. 1989). We evaluate the statute's clarity ourselves, giving no deference to the agency's interpretation. *SBC Communications Inc. v. FCC*, 138 F.3d 410, 418–19 (D.C. Cir. 1998).

Only if the statute is either silent or ambiguous on the question at issue do we defer to the agency's reasonable interpretation. *Chevron*, 467 U.S. at 842–43.

Before considering the Commission's plea for *Chevron* deference, we must address the AFL-CIO's argument that it should prevail at *Chevron* step one. Echoing the district court's reasoning, it argues that subsection (a)(12)(A)—"[a]ny notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made"—speaks directly to the question at issue by prohibiting the release of investigatory file materials in both open and closed cases. For its part, the Commission asserts that the term "investigation" refers only to the act of investigating a complaint, not to the fruits of the inquiry. According to the Commission, once a pending investigation has closed and later stages of the enforcement process have implicitly revealed the fact that the Commission engaged in the act of investigation, the statute simply does not address the confidentiality of related files.

As we read subsection (a)(12)(A), we cannot agree with the AFL-CIO that the term "investigation" *unambiguously* encompasses files compiled during a Commission proceeding. All other uses of "investigation" in section 437g(a) refer to a fact-finding process, not to materials compiled during that process. *See* 2 U.S.C § 437g(a)(1) (Commission "may not conduct any investigation or take any other action" based solely on anonymous complaints); *id.* § 437g(a)(2) (Commission "shall make an investigation of . . . [an] alleged violation, which may include a field investigation or audit," upon a finding of "reason to believe"); *id.* § 437g(a)(11) (Commission may petition to hold a party in civil contempt if it "determines after an investigation" that the party violated a court order). Moreover, we think it telling that in contrast to subsection (a)(12)(A), section 437g(a)'s other confidentiality provision expressly protects information revealed in the course of Commission enforcement actions. Specifically, subsection (a)(4)(B)(i) forbids the disclosure of *both* "action[s] by the

Commission or any person ... in connection with any conciliation attempt" *and* "information derived" in connection with such attempts. *Id.* § 437g(a)(4)(B)(i). Finally, the fact that subsection (a)(12)(A) permits disclosure upon written consent of "the person with respect to whom such investigation is made" without addressing the interests of third party witnesses who have provided confidential materials to investigators also implies that Congress was concerned about protecting the targets of Commission investigations, not the agency's sources of information.

The AFL-CIO argues that its interpretation is supported by viewing subsection (a)(12)(A) in the context of section 437g(a)'s larger structure, but we think that exercise further demonstrates that the statute has two possible meanings. According to the AFL-CIO, section 437g(a)'s express requirement to release Commission no-violation determinations and signed conciliation agreements, *id.* § 437g(a)(4)(B)(ii), would be superfluous if Congress had intended the Commission to release all investigatory file materials in every closed case. Thus, except for the limited disclosures required by subsection (a)(4)(B)(ii), the AFL-CIO asserts, subsection (a)(12)(A)'s confidentiality mandate continues to protect all other investigation-related documents even after an investigation has ended. This argument makes sense, however, only if subsection (a)(12)(A) in fact protects investigatory files. If, as the Commission maintains, the statute prohibits only disclosure of the fact that the Commission is engaged in the act of investigating a complaint, then the provision the AFL-CIO relies on merely serves to formally terminate that confidentiality requirement at the time the Commission either determines that no violation occurred or signs a conciliation agreement, since the release of a no-violation determination or conciliation agreement will implicitly reveal the fact that an investigation occurred. For that matter, so will the filing of a civil enforcement action or a dismissal challenge by an "aggrieved" party, neither of which is required to be litigated under seal. *Id.* § 437g(a)(6), (8).

The AFL-CIO next argues that the statute's legislative history supports its interpretation of the statute. To the extent the sparse legislative record provides any clue of

Congress's intent, however, we think it supports the Commission's interpretation. Congress provided no explanation when it enacted the original version of subsection (a)(12)(A) in 1974. Pub. L. No. 93-443, § 208(a) (1974). Scattered references in the legislative history of FECA's 1976 amendments, which added a civil penalty for subsection (a)(12)(A) violations and the confidentiality and disclosure requirements in what is now subsection (a)(4)(B), emphasize the importance of protecting the confidentiality of pending investigations and indicate that some members believed that subsection (a)(12)(A) helps to prevent political opponents from bringing baseless charges against each other for purposes of generating negative publicity. *See, e.g.*, H.R. CONF. REP. NO. 94-1057, at 49–50 (1976) ("The conferees' intent is that a violation within the meaning of [subsection (a)(12)(A)] occurs when publicity is given to a pending investigation, but [a violation] does not occur when actions taken in carrying out an investigation lead to public awareness of the investigation."); H.R. REP. NO. 94-917, at 66 (1976) (indicating that the penalty for violating subsection (a)(12)(A) applies to any party who reveals "the identity of any person under investigation"); 122 CONG. REC. 8566 (1976) (comments of Rep. Wayne Hays) (arguing when presenting the bill on the House floor that subsection (a)(12)(A) limits unfair publicity by prohibiting disclosure of "the fact that an individual is being investigated or is about to be investigated" until after the Commission has determined whether charges have merit). The legislative record, however, contains no references to protecting the confidentiality of closed Commission files or to the interests of parties who provide information during the course of an investigation.

Considering all of these factors together, we think the Commission may well be correct that subsection (a)(12)(A) is silent with regard to the confidentiality of investigatory files in closed cases and that Congress merely intended to prevent disclosure of the fact that an investigation is pending. But even if the AFL-CIO could convince us that its alternate construction represents the more natural reading of subsection (a)(12)(A), the fact that the provision can support two

plausible interpretations renders it ambiguous for purposes of *Chevron* analysis. *Nofziger*, 878 F.2d at 446–47.

Contrary to the AFL-CIO's contention, nothing in *In re Sealed Case*, 237 F.3d 657 (D.C. Cir. 2001), requires a different result. There we held that the Commission must file motions to enforce its investigatory subpoenas under seal because subsection (a)(12)(A) "plainly prohibit[s] the FEC from disclosing information concerning ongoing investigations under any circumstances without the written consent of the subject of the investigation." *Id.* at 666–67. In so holding, we had no need to address the issue we face here, as the Commission's disclosures in that case revealed *both* that an investigation was pending against a particular party *and* several individual file documents compiled during the course of the agency's investigation. *See id.* at 662 (Commission filed in open court the complaint, a staff analysis detailing the alleged violations, the Commission's "reason to believe" finding, and information concerning an unrelated investigation). Also, we specifically limited our analysis to the context of *ongoing* investigations where, because secrecy is needed to protect an innocent accused from damaging publicity, respondents have a "strong confidentiality interest" analogous to the interests of targets of grand jury investigations. *Id.* at 667. But that analogy breaks down once a Commission investigation closes because FECA expressly requires disclosure of "no violation" findings, 2 U.S.C. § 437g(a)(4)(B)(ii), whereas Federal Rule of Criminal Procedure 6(e)(6) continues to protect suspects exonerated by a grand jury. *Illinois v. Abbott & Assocs.*, 460 U.S. 557, 566 n.11 (1983).

## III.

We turn, then, to the *Chevron* step two issue—whether the Commission's post-investigation disclosure policy reflects "a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The parties devote many pages of briefing to this issue: The Commission argues that it deserves particular deference because its regulation embodies a longstanding procedural policy, while the AFL-CIO questions the policy's

historical and legal origins. At this stage of our *Chevron* analysis, we would normally accord "'considerable deference'" to the Commission, *United States v. Kanchanalak*, 192 F.3d 1037, 1049 (D.C. Cir. 1999) (citation omitted), particularly where, as here, Congress took no action to disapprove the regulation when the agency submitted it for review pursuant to 2 U.S.C. § 438(d). *See, e.g.*, *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 34 (1981). As the AFL-CIO points out, however, because we are also "obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress," we do not accord the Commission deference when its regulations create "serious constitutional difficulties." *Chamber of Commerce v. FEC*, 69 F.3d 600, 604–05 (D.C. Cir. 1995) (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 438 U.S. 568, 575 (1988)). This is just such a case because Congress's failure to act obviously cannot be viewed as a clear expression of intent and because, as we shall show, the Commission failed to tailor its disclosure policy to avoid unnecessarily infringing upon First Amendment rights.

We begin with a little background. The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of membership lists). When facing a constitutional challenge to a disclosure requirement, courts therefore balance the burdens imposed on individuals and associations against the significance of the government interest in disclosure and consider the degree to which the government has tailored the disclosure requirement to serve its interests. *Buckley*, 424 U.S. at 64–68; *Block v. Meese*, 793 F.2d 1303, 1315–16 (D.C. Cir. 1986). Where a political group demonstrates that the risk of retaliation and harassment is "likely to affect adversely the ability of . . . [the group] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advo-

cate," for instance, the government may justify the disclosure requirement only by demonstrating that it directly serves a compelling state interest. *NAACP*, 357 U.S. at 462–63. In contrast, where the burden on associational rights is "insubstantial," we have upheld a disclosure requirement that provided "the only sure means of achieving" a government interest that was, though valid, "not . . . of the highest importance." *Block*, 793 F.2d at 1316–18. Furthermore, even where requiring disclosure of political or speech activities to a *government agency* may be necessary to facilitate law enforcement functions, we have held that "[c]ompelled *public* disclosure presents a separate first amendment issue" that requires a separate justification. *Id.* at 1315 (emphasis added).

In affidavits submitted in the district court, the AFL-CIO and DNC assert that releasing the names of hundreds of volunteers, members, and employees will make it more difficult for the organizations to recruit future personnel. The Commission urges us to dismiss this assertion of a chilling effect as speculative. Although we agree that the evidence in this case is far less compelling than the evidence presented in cases involving groups whose members had been subjected to violence, economic reprisals, and police or private harassment, *see, e.g., Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 99 (1982); *NAACP*, 357 U.S. at 462, that difference speaks to the strength of the First Amendment interests asserted, not to their existence. In *Buckley v. Valeo*, for example, the Supreme Court concluded—without considering either the popularity of the parties involved or any specific evidence of retaliation—that disclosure of campaign contributions would chill political activity and therefore place "not insignificant burdens" on First Amendment rights. 424 U.S. at 65–66, 68. Although it is true, as the Commission points out, that a separate part of the opinion held that minority parties could be exempted from disclosure requirements by demonstrating "a reasonable probability . . . [of] threats, harassment, or reprisals," the Commission fails to note that the Court required such an evidentiary showing only after concluding that the disclosure

requirements at issue survived strict scrutiny as the least intrusive means of achieving several compelling government interests. *Id.* at 69–74; *see also Cmty.–Serv. Broad. of Mid– Am., Inc. v. FCC*, 593 F.2d 1102, 1118 & n.38 (D.C. Cir. 1978) (en banc) (Wright, C.J., joined by Wilkey, J.) (noting that *Buckley* engaged in a full First Amendment analysis despite the absence of concrete evidence of retaliation).

Moreover, in addition to arguing that disclosure will chill future individual political activity, the AFL-CIO and DNC affidavits charge that disclosing detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies will directly frustrate the organizations' ability to pursue their political goals effectively by revealing to their opponents "activities, strategies and tactics [that] we have pursued in subsequent elections and will likely follow in the future." Rosenthal Aff. at 2–4; *see also* Stoltz Aff. at 3. The Commission does not challenge the factual basis for this claim. Although we have found no cases presenting similar facts, the Supreme Court has concluded that extensive interference with political groups' internal operations and with their effectiveness does implicate significant First Amendment interests in associational autonomy.

For example, in *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989), the Court held that California statutes dictating the composition and leadership of political parties' governing bodies burdened significant associational rights by "limit[ing] a political party's discretion in how to organize itself, conduct its affairs, and select its leaders," thereby also potentially "color[ing] the parties' message and interfer[ing] with the parties' decisions as to the best means to promote that message." *Id.* at 229–31 & n.21. In the same case, the Court applied strict scrutiny to a section of the statute that prohibited party leaders from endorsing candidates in primaries because such limitations "directly hamper[ ] the ability of a party to spread its message." *Id.* at 223. Similarly, in *Tashjian v. Republican Party*, 479 U.S. 208, 224 (1986), where the Court struck down a closed primary system, it held, "[t]he Party's determination of the boundaries of its own association, and of the structure

which best allows it to pursue its political goals, is protected by the Constitution." Even the Court's compelled disclosure decisions emphasize the potential damage to political groups' effectiveness, in addition to the risk of chilling individual participation. In *Buckley*'s analysis of contribution disclosure requirements, for example, the Court explained, "[t]he right to join together 'for the advancement of beliefs and ideas,' is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.'" 424 U.S. at 65–66 (quoting *NAACP*, 357 U.S. at 460) (citation omitted); *see also Ripon Soc'y, Inc. v. Nat'l Republican Party*, 525 F.2d 567, 585 (D.C. Cir. 1975) (en banc) (plurality opinion) ("Speeches and assemblies are after all not ends in themselves but means to effect change through the political process. If that is so, there must be a right not only to form political associations but to organize and direct them in the way that will make them most effective.").

In this case, the AFL-CIO and DNC affidavits indicate that compelled disclosure of internal planning materials, though less direct than regulation of political group leadership or structure, will similarly frustrate those groups' decisions as to "how to organize . . . [themselves], conduct . . . [their] affairs, and select . . . [their] leaders," as well as their selection of a "message and . . . the best means to promote that message." *Eu*, 489 U.S. at 230–31 & n.21. Although we do not suggest that any Commission action that places a political association at a disadvantage relative to its opponents violates the First Amendment, where, as here, the Commission compels public disclosure of an association's confidential internal materials, it intrudes on the "privacy of association and belief guaranteed by the First Amendment," *Buckley*, 424 U.S. at 64, as well as seriously interferes with internal group operations and effectiveness.

Having concluded that the AFL-CIO and DNC have asserted substantial First Amendment interests in the disclosure of their own internal materials and at least marginal interests in preventing the chilling of political participation by their members and officials, we proceed to assess the strength of the

government's proffered interest in disclosure. The Commission offers two justifications for 11 C.F.R. § 5.4(a)(4): The regulation deters FECA violations, and it promotes the agency's own public accountability. Although we have no doubt that these interests are valid, we need not engage in a detailed balancing analysis, for the Commission made no attempt to tailor its policy to avoid unnecessarily burdening the First Amendment rights of the political organizations it investigates. *See, e.g.*, *United States v. Popa*, 187 F.3d 672, 676 (D.C. Cir. 1999) (declining to determine the precise level of scrutiny applicable to a particular statute where it was insufficiently tailored to meet even the least exacting standard). Indeed, the blanket nature of the Commission's regulation—requiring, as it does, the release of *all* information not expressly exempted by FOIA—appears to result in the release of significant amounts of information that furthers neither goal. For example, the Commission never explains how releasing investigatory files will deter future violations in cases where, as here, the respondents have been cleared of wrongdoing. Nor does the Commission explain how a policy requiring the release of materials that played no meaningful role in its decisionmaking process will promote its own accountability. The facts of this case are particularly disturbing because the Commission proposes to release between 10,000 and 20,000 pages of documentation that it has never examined. The materials therefore cannot shed light on the Commission's reasoning, and may not even relate to questionable activities. The fact that the Commission redacts information falling under one or more FOIA exemptions is no answer, since the Freedom of Information Act does little to protect the First Amendment interests at issue.

Adding to the First Amendment concerns in this case, the AFL-CIO and James Madison Center argue—persuasively in our view—that when combined with the Commission's broad subpoena practices, the automatic disclosure regulation "encourages political opponents to file charges against their competitors to serve the dual purpose of 'chilling' the expressive efforts of their competitor and learning their political strategy so that it can be exploited to the complainant's

advantage." Madison Amicus Br. at 20. We have no doubt, as agency counsel explained at oral argument, that the Commission does its best to screen out frivolous complaints at the "reason to believe" stage, but such efforts do nothing to reduce the incentive for political adversaries to attempt to turn the Commission's disclosure regulation to their own advantage. As this case demonstrates, the release policy gives parties a large potential "bonus" for filing a complaint because even if their allegations of wrongdoing are rejected, they may still obtain access to thousands of pages of their opponents' internal strategic information.

The Commission argues that no First Amendment problem exists here because it is "merely disclosing its own agency records to the public . . ., rather than coercing a private party to produce information." Commission Reply Br. at 24. This position is quite remarkable. FECA authorizes the Commission to order any person to submit written reports and answer its questions, to subpoena witnesses to testify or present documentary evidence, and to seek judicial enforcement of such orders and subpoenas. 2 U.S.C. § 437d(a)(1), (a)(3), (b). Thus, agency investigators do use "some actual or threatened imposition of governmental power or sanction'" to obtain information from respondents and other witnesses. *Penthouse Int'l Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991). While it is true, as the Commission asserts, that political groups could seek protective orders to ensure confidentiality, turning every discovery request and subpoena into a First Amendment court battle would burden both the judiciary and the Commission. Furthermore, the considerable time that transpires between an initial subpoena and the Commission's ultimate public disclosure of a closed case file does not somehow convert the materials involved into the Commission's "own agency records." Rather, where the Commission compiles information relating to speech or political activity for law enforcement purposes, our case law requires that it provide a separate First Amendment justification for publicly disclosing the materials. *Block*, 793 F.2d at 1315–16.

In sum, although we agree that deterring future violations and promoting Commission accountability may well justify releasing more information than the minimum disclosures required by section 437g(a), the Commission must attempt to avoid unnecessarily infringing on First Amendment interests where it regularly subpoenas materials of a "delicate nature . . . represent[ing] the very heart of the organism which the first amendment was intended to nurture and protect." *Machinists Non–Partisan Political League*, 655 F.2d at 388. Because 11 C.F.R. § 5.4(a)(4) fails to undertake this tailoring, it creates the "serious constitutional difficulties" outlined above. *Chamber of Commerce*, 69 F.3d at 605. We therefore conclude that the regulation is impermissible.

We end with a comment about the concurring opinion, which reads *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 438 U.S. 568 (1988), as requiring that we account for the constitutional concerns at step one of the *Chevron* analysis. Were there only one way to read the statute that would avoid constitutional problems, we might well agree, for "Congress . . . is bound by and swears an oath to uphold the Constitution[,] [and] [t]he courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Id.* at 575. But here the statute is susceptible to more than one constitutionally permissible interpretation: As we have indicated, the Commission could tailor its disclosure policy to avoid unnecessary First Amendment infringements, or, as the concurrence maintains, it could decline to release any materials other than those expressly required by section 437g(a). Neither *DeBartolo* nor *Chevron* suggest that the court—as opposed to the agency—should choose between these permissible alternatives. Rather, *DeBartolo*'s mandate that " 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality,' " *id.* (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)), suggests merely that an agency acts unreasonably if, instead of choosing among constitutionally permissible alternatives, it interprets ambiguous statutory language as indicating that Congress intended to authorize

infringements on constitutional rights. Thus, we think the constitutional issues raised by the Commission's disclosure policy are properly addressed at *Chevron* step two. *See, e.g.*, *Chamber of Commerce*, 69 F.3d at 604–05 (addressing constitutional problems created by the Commission's interpretation of an undefined statutory term at step two of the *Chevron* analysis).

The judgment of the district court is affirmed.

*So ordered.*

1

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

We are asked in this case, as in so many others, to dance the *Chevron* two-step, under which

> the court must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue.... If the court can determine congressional intent, then that interpretation must be given effect.... If, on the other hand, the statute is silent or ambiguous with respect to the specific issue, then the court will defer to a permissible agency construction of the statute.

*NRDC v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (internal quotations omitted); *see Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Unlike the majority, I would stop the music at *Chevron* step one. In my view, a proper employment of "the traditional tools of statutory construction" yields a plain and affirmative congressional response "to the precise question at issue"—i.e., whether the Federal Election Campaign Act (FECA or Act) prohibits the Federal Election Commission (FEC or Commission) from disclosing thousands of pages of politically sensitive documents it obtained while investigating the AFL–CIO and the DNC (collectively, the appellees), now that the investigation has been completed.

My inquiry into the Congress's intent proceeds, as it must, from "the fundamental canon that statutory interpretation begins with the language of the statute itself." *Butler v. West*, 164 F.3d 634, 639 (D.C. Cir. 1999) (quotation omitted); *see* HENRY J. FRIENDLY, BENCHMARKS 202 (1967) ("(1) Read the statute; (2) read the statute; (3) read the statute!" (quoting Justice Frankfurter's "threefold imperative to law students")). The Act's confidentiality provision states, in full, that

> [a]ny notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made.

2 U.S.C. § 437g(a)(12)(A). Stretching the text in hopes of reaching the deference it enjoys under *Chevron* step two, the Commission contends that section 437g(a)(12)(A) "does not specifically address closed cases, and its silence about whether and when the confidentiality requirement expires leaves Congress's intent on that question ambiguous." Br. of Appellant at 14; *see id.* at 16–17 (citing *United States v. Kanchanalak*, 192 F.3d 1037, 1049 (D.C. Cir. 1999) (FEC's interpretation of FECA deserves "considerable deference" where statute ambiguous)). I disagree. While the provision does not state in so many words that "no *completed* investigation shall be made public," that does not mean it is silent on the matter; whatever the word "investigation" means, section 437g(a)(12)(A) plainly covers "*[a]ny . . .* investigation," ongoing or completed. 2 U.S.C. § 437g(a)(12)(A) (emphasis added). Indeed, even though the provision does not *explicitly* state that "the FEC may not file information concerning an ongoing investigation on the public record when it seeks to enforce a subpoena," we recently held that it "unambiguously," "directly" and "unequivocally" prohibits precisely that. *See In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001). Taken to its logical conclusion, the FEC's argument would render every prohibition in the United States Code susceptible of ambiguity. "Thou shall not kill" is a mandate neither silent nor ambiguous about whether murder is permissible if committed after 5.00 p.m.—or, for that matter, if committed in the billiard room with the candlestick—but the FEC's reasoning would lead one to conclude otherwise.

Moreover, the fact that the provision does not specify "when the confidentiality requirement expires" suggests to me that it *never* expires. Resisting this logic, the Commission contends that the "disclosures . . . required by other provisions of section 437g(a) when the administrative proceeding concludes . . . make section 437g(a)(12)(A) inapplicable to

closed cases." Br. of Appellant at 20–21. In doing so, the FEC again neglects the plain language of the statute; section 437g(a)(12)(A)'s prohibition against disclosure of an "investigation" or a "notification" admits of no textual exceptions. *See Sealed Case*, 237 F.3d at 667. True, section 437g(a) elsewhere states that "the Commission shall make public any *conciliation agreement* signed by both the Commission and the respondent." 2 U.S.C. § 437g(a)(4)(B)(ii) (emphasis added). True, it also provides that "[i]f the Commission makes a determination that a person has not violated this Act . . . [it] shall make public such *determination*." *Id.* (emphasis added). But section 437g(a) nowhere requires or permits the FEC to disclose an "investigation" or a "notification." Nor should we be willing, in the face of well-settled principles of statutory construction, to equate the distinct terms—"investigation"/"notification" on the one hand and "conciliation agreement"/"determination" on the other—such that disclosure of an "investigation" is permitted under the circumstances enumerated in section 437g(a)(4)(B)(ii). *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotations omitted)); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding . . . that the differing language in the two subsections has the same meaning in each."); *see also* 2A NORMAN J. SINGER, SUTHERLAND'S STATUTES AND STATUTORY CONSTRUCTION § 46.06, at 194 (6th ed. 2000) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). If the Congress had meant to exclude the majority[1] of "investigation[s]" from the otherwise comprehensive shelter of section 437g(a)(12)(A), it would have done so more obviously than the FEC suggests—either by including "investigation" in section 437g(a)(4)(B)(ii), as it did in section 437g(a)(12)(A), or

---

[1] There are far fewer open cases at any given time than there are closed ones—a disparity that will inevitably grow over time as ongoing investigations are completed.

by removing completed "investigation[s]" from the latter's coverage explicitly. *See Russello*, 464 U.S. at 23 ("We would not presume to ascribe this difference [in the subsections' language] to a simple mistake in draftsmanship."); *cf. Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 191 (1981) ("If Congress had intended to remove a whole category of constitutional challenges from the purview of § 437h, thereby significantly limiting the usefulness of that provision, it surely would have made such a limitation explicit."). In my view, therefore, section 437g(a)(12)(A) plainly prohibits publication of any "investigation," whether it is ongoing or completed.

In a belated nod to ordinary meaning, and in the absence of a statutory definition, the Commission claims that "investigation" refers to "a *process* for discovering facts, not a file of documents."[2] Br. of Appellant at 22 (citing BLACK'S LAW DICTIONARY 825 (6th ed. 1990); 8 OXFORD ENGLISH DICTIONARY 47 (2d ed. 1989); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 1004 (2d ed. 1983)) (emphasis in original). It argues that section 437g(a)(12)(A) prohibits disclosure of the *fact* that an investigative process is occurring or has occurred but does not cover the *documents* generated during the process. Once again, I disagree.

Although we observed in *Sealed Case* that the main purpose of section 437g(a)(12)(A) is "to protect [an] . . . accused who is exonerated from disclosure of the *fact* that he has been under investigation," *Sealed Case*, 237 F.3d at 667 (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 n.6 (1958)) (emphasis added), we suggested as well that the "investigation[s]" to be kept confidential include all documen-

---

[2] As the appellees point out, the FEC did not articulate this proposition "in its administrative dispositions of [the appellees'] objections to public release of the investigative file, where the Commission otherwise extensively analyzed FECA, its legislative history, the FEC's regulations and FOIA." Br. of Appellees at 19 n.11. "Rather," they note, "this argument first surfaced in the FEC's briefs on the cross-motions for summary judgment." *Id*.

tary materials gathered during the "process" to which the FEC refers:

> When the FEC issues a subpoena as part of an investigation, § 437g mandates those subpoenas, like other *components* of the investigation, "shall not be made public." . . . . Even if we assume that the FEC's argument is correct (which it is not) and the Commission could disclose the subpoenas themselves (which it cannot), the Commission would still lack the authority to divulge *information* pertaining to the underlying investigation . . . .

*Sealed Case*, 237 F.3d at 667–68 (emphases altered); *see id.* at 668 ("We cannot fathom why the FEC's issuance of a subpoena in furtherance of an ongoing investigation would not be considered part of that 'investigation' within the meaning of § 437g."). Indeed, we stated without qualification that the FEC cannot "*under any circumstances* . . . introduce evidence concerning an ongoing investigation on the public record" without the written consent of the subject of the investigation.[3] *Id.* at 667, 669 (emphasis added).

Even if *Sealed Case* does not give an all-encompassing interpretation to "investigation"—and I acknowledge that it (properly) does not—the thoroughgoing First Amendment analysis in today's majority opinion, in my view, removes any doubt that the term covers the documents at issue here. The majority quite justifiably echoes the concern of *amicus curi-*

---

[3] Even if the Commission's reading of "investigation" were correct, section 437g(a)(12)(A) would nonetheless prohibit the FEC from disclosing several of the documents it planned to (and initially did) publicize in April 2001. The written correspondence among and between the appellees, their counsel and the Commission, for example, would inevitably reveal upon publication the *fact* that the appellees had been investigated. Because the correspondence is neither a "conciliation agreement signed by both the Commission and the [appellees]," 2 U.S.C. § 437g(a)(4)(B)(ii), nor a "determination that [the appellees have] not violated this Act," *id.*, the Act would plainly foreclose publication of the correspondence even under the Commission's "process" interpretation of "investigation."

*ae*, the James Madison Center for Free Speech, that the Commission's automatic disclosure policy "encourages political opponents to file charges against their competitors to serve the dual purpose of 'chilling' the expressive efforts of their competitor and learning their political strategy so that it can be exploited to the complainant's advantage." Maj. op. at 15–16 (quoting Br. of *Amicus Curiae* James Madison Center at 20). I agree that the Commission has failed to show that the speech-chilling disclosure regulation set forth in 11 C.F.R. § 5.4 bears a "relevant correlation or substantial relation" to a "substantial governmental interest[ ]." *Buckley v. Valeo*, 424 U.S. 1, 64, 68 (1976) (per curiam) (quotations omitted); *see* maj. op. at 14–15. But I believe the majority commits an error—if only a minor one—in holding that the "serious constitutional difficulties" raised by the regulation preclude the court from deferring to the Commission's interpretation *at Chevron step two*. *Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995); *see* maj. op. at 10–11. In my view, those very same difficulties vindicate, *at Chevron step one*, the appellees' contention that the Act "unambiguously" prohibits the FEC from publicizing the documents at issue. *Chevron*, 467 U.S. at 843; *see* Br. of Appellees at 12–27; *see also AFL–CIO v. FEC*, 177 F. Supp. 2d 48, 59 (D.D.C. 2001) ("[T]he plain meaning of § 437g(a)(12)(A) prohibits the FEC from disclosing the investigative file.").

Among the "traditional tools of statutory construction" "the court must first exhaust" under *Chevron* and its progeny are the linguistic and substantive canons of interpretation, one of which—the canon of "constitutional avoidance"—is particularly useful in resolving the dispute before us. Invoking the canon in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988), the United States Supreme Court held that "where an otherwise acceptable [agency] construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 575. Language like this might suggest that the canon operates at

*Chevron* step two or even displaces *Chevron* altogether. But the Court in *DeBartolo* made clear that the avoidance canon

> not only reflects the prudential concern that constitutional issues [should] not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress *intended* to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

*DeBartolo*, 485 U.S. at 575 (emphasis added); *see Grenada County Supervisors v. Brogden*, 112 U.S. 261, 269 (1884) ("It ought never to be assumed that the law-making department of the government intended to usurp or assume power prohibited to it." (quotation omitted)). In other words, the canon assists us in determining the Congress's intent and, accordingly, it operates at *Chevron* step one. Circuit precedent supports this proposition; we recently reaffirmed that "[i]f employment of an accepted canon of construction illustrates that Congress had a specific intent on the issue in question, then the case can be disposed of under the first prong of *Chevron*." *Halverson v. Slater*, 129 F.3d 180, 184 (D.C. Cir. 1997) (emphasis and quotations omitted); *see Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir.), *aff'd by equally divided Court*, 493 U.S. 38 (1989).

In sum, I do not believe the Congress intended section 437g(a)(12)(A) to apply so narrowly as to permit the Commission to publicize the documents at issue, in light of the "serious constitutional difficulties" attending such publication.

\* \* \*

For the foregoing reasons, I would hold that section 437g(a)(12)(A) plainly prohibits the FEC from disclosing investigative records pertaining to a completed investigation if the investigated party does not consent to disclosure. While I disagree somewhat with the reasoning of my colleagues, I do agree that the district court's December 19, 2001 judgment

should be affirmed because the Commission's interpretation of the Act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).