# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2008       Decided February 10, 2009

No. 08-1234

VERIZON CALIFORNIA, INC., ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

QWEST COMMUNICATIONS INTERNATIONAL INC., ET AL.,
INTERVENORS

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Michael K. Kellogg* argued the cause for petitioners. On the briefs were *Aaron M. Panner*, *Andrew G. McBride*, *William P. Barr*, *Michael E. Glover*, and *Karen Zacharia.*

*Bennett L. Ross*, *Joshua S. Turner*, *Thomas R. McCarthy*, *Joshua H. Seidermann*, and *Robert B. McKenna Jr.* were on the briefs for intervenors United States Telecom Association and Independent Telephone & Telecommunications Alliance. *Craig E. Gilmore*, *Lawrence C. Keller*, and *Lewis A. Tollin* entered appearances.

*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, *Matthew B. Berry*, General Counsel, Federal Communications Commission, *Joseph R. Palmore*, Deputy General Counsel, and *Richard K. Welch*, Acting Deputy Associate General Counsel. *Joel Marcus*, Counsel, Federal Communications Commission, entered an appearance.

*Donald B. Verrilli Jr.* argued the cause for intervenors Comcast Corporation, et al. With him on the brief were *Mark D. Schneider*, *Christopher W. Savage*, *Matthew A. Brill*, *J. Scott Ballenger*, *Brian W. Murray*, and *Lori Alvino McGill*.

*Daniel L. Brenner*, *Neal M. Goldberg*, and *Michael S. Schooler* were on the brief for *amicus curiae* National Cable & Telecommunications Association in support of respondents.

*Gene Kimmelman* and *Chris Murray* were on the brief for *amicus curiae* Consumers Union in support of respondents.

Before: SENTELLE, *Chief Judge*, and TATEL, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: When a telephone service provider loses a phone customer, the customer is entitled to "port" the existing phone number to the new service provider. The latter initiates a Local Service Request ("LSR"), which spurs the original provider into the necessary technical action. The LSR also, of course, alerts the outgoing provider to its imminent loss of a customer, and providers

may naturally be tempted to seize the chance to make a last plea to the customer to remain loyal.

Verizon California, Inc., an incumbent local exchange carrier, faces competition from cable companies that provide voice services over Internet Protocol. It has in fact used information provided by the LSR process to contact defecting customers and offer them various incentives to stay with Verizon, all before the number port is completed. (Verizon's efforts to win back customers *after* the completion of LSRs are not at issue.)

Three cable companies—Bright House Networks, LLC, Comcast Corporation, and Time Warner Cable Inc.—filed a complaint about Verizon's practice with the Federal Communications Commission. They argued that Verizon's retention efforts violated the Telecommunications Act's restrictions on carriers' use of other carriers' proprietary information for marketing purposes. 47 U.S.C. § 222(b). The FCC agreed and ordered Verizon to cease and desist from these efforts. *Bright House Networks, LLC v. Verizon Cal., Inc.*, 23 FCC Rcd 10704, 10723 ¶ 48 (2008) ("*Order*").

Verizon petitioned for review of the *Order*, mainly arguing that the FCC had misinterpreted § 222(b) by applying it where a telecommunications service is provided only by a carrier *submitting* an LSR (here, the cable companies), not the one *receiving* it (Verizon). Finding the FCC's interpretation of § 222(b) reasonable, and rejecting Verizon's other contentions, we deny the petition.

* * *

Section 222(b) ("Confidentiality of carrier information") reads,

A telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts.

47 U.S.C. § 222(b).

Before proceeding to the main issue, we note our agreement with the Commission "that advance notice of a carrier change that one carrier is required to submit to another is carrier 'proprietary information' under section 222(b)." *Order*, 23 FCC Rcd at 10709 ¶ 13 & n.42. Of course the receiving carrier already knows its own customer's name and phone number, but the information that a competitor has just won the customer over, which is vital to the timing of Verizon's retention marketing, is proprietary information that the competitor discloses only because it must do so in order to effect the number port, *id*. ¶ 12.

The main disagreement between the parties revolves around the phrase "for purposes of providing any telecommunications service." 47 U.S.C. § 222(b). Does it refer only to information received for purposes of *the receiving carrier's* provision of a telecommunications service (Verizon's position) or does it also cover situations where information is received for purposes of *the submitting carrier's* provision of such service (the FCC's position)? At least without classifying the receiving carrier's role in the porting process as provision of a telecommunications service (a view that presents some difficulties), the distinction is critical, as the information provided to Verizon via an LSR is to enable the submitting carrier, and not Verizon, to provide a telecommunications service.

Under the familiar *Chevron* framework, we defer to the FCC's reasonable interpretation so long as it doesn't contradict the Act's unambiguous text. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–44 (1984). Of course, as with all agency actions subject to the Administrative Procedure Act, the interpretation also must not be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

We do not believe that the statutory language is unambiguously contrary to the FCC's interpretation. Section 222(b) does not explicitly state which carrier is to provide the telecommunications service. Granted, the first reading that comes to mind is that the statute covers only situations where the receiving carrier is the one providing such a service. To use an example offered by Verizon, in the sentence "Joe received information from Mary for purposes of drafting a brief," it is overwhelmingly likely that the speaker expects Joe to do the drafting. But one can imagine contexts where Mary would be understood as the prospective drafter—where, for example, Joe was to use the information to develop a legal argument or to organize factual material and provide the results to Mary for *her* brief-writing. The context is key.

Understandably, therefore, the FCC looked to the context of § 222(b), including its own precedent. The FCC had earlier tackled the problem of so-called "slamming"—the practice of submitting or executing an unauthorized change in a subscriber's telephone service provider. There, similarly, a new provider submits information to its predecessor to enable the submitting carrier to provide service. The Commission held that information so received "may *only* be used by the executing carrier [the losing competitor] to effectuate the *provision of service by the submitting carrier to its customers*." *In re Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996: Policies and Rules Concerning Unauthorized*

*Changes of Consumers' Long Distance Carriers*, 18 FCC Rcd 5099, 5109 ¶ 25 (2003) (emphasis added), *quoted in Order*, 23 FCC Rcd at 10712 ¶ 21. To be sure, the ruling did not offer a linguistic exegesis of § 222(b), but in treating § 222(b) as binding the executing carrier even though it is *not* to be providing the service at issue, the ruling at the very least constitutes a precedent. Verizon seems not to dispute the existence of the precedent, nor its soundness as a matter of statutory interpretation. Rather it asserts the anti-slamming ruling "cannot be read this way because it addressed local carriers' provision of exchange access service—a wholesale telecommunications service that is provided to the carrier submitting the information." Verizon Reply Br. 13 n.8. But the point of the ruling, for our purposes, is simply the application of § 222(b) where the service in question was only the service to be provided by the *submitting carrier*.

Verizon's interpretation, moreover, would lead to an anomalous result. Its argument against the cable company complainants turns entirely on the point that they will provide the new telecommunications service exclusively with their own facilities. As Verizon reads it, the statute would protect carriers that *purchased* telecommunications service from Verizon on a wholesale basis and then resold it to their own customers, and carriers that *leased* unbundled network elements from Verizon for the provision of telecommunications service, but *not* carriers like the complainants that simply submitted LSRs to Verizon so that they could provide telephone service with their own facilities. Yet, the Commission noted, it has read the basic statute, the Telecommunications Act of 1996, as having the promotion of facilities-based local competition as its fundamental policy, *Order*, 23 FCC Rcd at 10714 ¶ 27, a reading which we have readily accepted, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 577 (D.C. Cir. 2004).

Verizon argues that the FCC's interpretation raises serious First Amendment difficulties and accordingly should enjoy less than full *Chevron* deference. It is true that there are certain oddities in the Commission's justification of the rule. It confined itself to cross-referencing *In re Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996: Policies and Rules Concerning Unauthorized Changes of Consumer Long Distance Carriers*, 14 FCC Rcd 1508, 1573–75 ¶¶ 107–11 (1998) (the "*1998 Anti-Slamming Decision*"), where it had justified a similar application of § 222(b) largely in terms of "eliminating restraints on competition," *id*. at ¶ 108. But of course the *Order* itself *imposes a restraint* on competition; and Verizon submitted a study, undiscussed by the Commission, setting forth claims that continuation of its marketing program would generate $75–79 million in benefits for telephone customers over a five-year period, Joint Appendix ("J.A.") 259 ¶ 28.

But a study of the *Order* and the *1998 Anti-Slamming Decision* makes clear that the Commission's concern is really to assure the losing carrier's neutral role in the execution process (here, execution of porting). *Order*, 23 FCC Rcd at 10713 ¶ 22. Neutrality, as the FCC explained at oral argument, helps avoid the "two-masters problem," to make sure that Verizon's incentive on receiving an LSR is unambiguously to complete it promptly and effectively. Oral Arg. Tr. 28–30. For example, despite the parties' stipulation that "Verizon does not have a practice of delaying the porting of numbers in order to engage" in retention marketing, J.A. 272, there is evidence in the record that the combination of Verizon's retention marketing with its LSR process has introduced unnecessary errors into its number porting, Supplemental Appendix 60–62. Thus the FCC's basic determination was to eliminate the apparent conflict of interest, compelling Verizon to focus first on completing the

result of another carrier's successful marketing before engaging in its own.

This analysis compels our rejection of Verizon's First Amendment argument. The *Order* limits commercial speech, and thus need satisfy only intermediate scrutiny. See *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). We agree with the FCC that curing the two-masters problem is a substantial interest and that the prohibition against retention marketing during the short time period while an LSR is pending advances that interest directly and is "designed carefully" to achieve the stated goal. *Order*, 23 FCC Rcd at 10721 ¶ 44 n.109 (citing the *1998 Anti-Slamming Decision*, 14 FCC Rcd 1508, 1573–75 ¶¶ 107–11 (1998)). As the Commission noted in the *1998 Anti-Slamming Decision*, the executing carrier is disabled only from using an opportunity fortuitously placed in its hands by a technological necessity—the fact that its technical cooperation is essential to implementation of the submitting carrier's competitive victory. See 14 FCC Rcd at 1574–75 ¶¶ 109–10. We thus do not find a First Amendment violation, nor even the sort of serious constitutional difficulty that would counsel against extending *Chevron* deference to the FCC's interpretation of § 222(b). Cf. *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) ("[W]e do not accord [an agency] deference when its regulations create serious constitutional difficulties." (quotation omitted)).

* * *

Verizon also contends that at the very least we should vacate the *Order* with respect to two carriers affiliated with and serving Comcast and Bright House. These affiliates, the argument goes, are not "telecommunications carriers" within the meaning of the Act because they do not hold themselves

out as common carriers, "undertak[ing] to carry for all people indifferently." *V.I. Tel. Corp. v. FCC*, 198 F.3d 921, 926 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976), and citing the Act's definition of the term "telecommunications service" as "offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used," 47 U.S.C. § 153(46)). (Verizon does not dispute that Sprint Communications Company L.P., the carrier serving Time Warner, is in fact a common carrier.) Though the issue is closer, we do not find the Commission's classification unlawful.

The FCC found that three pieces of evidence, taken together, amounted to a prima facie case that the affiliates had held themselves out as common carriers. First, they self-certified that they do and will continue to operate as common carriers, serving all similarly situated customers equally. *Order*, 23 FCC Rcd at 10718 ¶ 39. Second, the carriers entered into publicly available interconnection agreements with Verizon, something that Verizon was obligated to do only if the other entities were in fact telecommunications carriers. *Id.* at 10718–19 ¶¶ 39–40 & n.99. Verizon's behavior is telling. Interconnection obligations curtail potential anticompetitive advantages that network effects might afford a local exchange carrier, see Jonathan E. Nuechterlein & Philip J. Weiser, *Digital Crossroads* 80 (2005), advantages Verizon would presumably be loath to give up. Finally, each carrier obtained a state certificate of public convenience and necessity, thereby giving public notice of its intent to act as a common carrier. *Order*, 23 FCC Rcd at 10718 ¶ 39. While none of the three facts by itself seems compelling, in the aggregate they appear enough to render the Commission's conclusion reasonable.

Like the Commission, we are not troubled by the fact that Bright House and Comcast-affiliated carriers are currently serving only their affiliates. As the FCC explained, "[i]f a voice services provider similarly situated to Comcast and Bright House were looking for a provider of these services, the Comcast and Bright House Competitive Carriers would be obvious choices." *Id*. at 10719 ¶ 40. Verizon does not present any evidence to suggest that the disputed affiliates would turn away such a customer.

In our court, Verizon makes much of the fact that the Commission, having concluded that the two carriers were telecommunications carriers for purposes of § 222(b), left open a possibility that they might not be telecommunications carriers for purposes of other provisions of the Act. See *id*. ¶ 41. That, says Verizon, is the very definition of arbitrary and capricious decisionmaking. But the Commission simply refrained from reaching any decision as to the classification of the affiliates in other statutory contexts. It said, "We leave those determinations for another day." *Id*. Although a phrase in a statute is typically assumed to have the same meaning throughout, "it is not impermissible under *Chevron* for an agency to interpret an imprecise term differently in two separate sections of a statute which have different purposes." *Abbott Labs. v. Young*, 920 F.2d 984, 987 (D.C. Cir. 1990), *quoted in Order*, 23 FCC Rcd at 10719–20 ¶ 41 n.100. "Identical words may have different meanings where [among other things] the conditions are different." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). Because of that possibility—different contexts dictating different interpretations—courts addressing the meaning of a term in one context commonly refrain from any declaration as to its meaning elsewhere in the same statute. We cannot see that the Commission's non-resolution

of these other issues rendered its reasoning any more questionable than would a court's similar exercise of caution.

\* \* \*

Verizon's petition for review is accordingly

*Denied.*