298 F.Supp.2d 104 (2004)
AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, Plaintiff,
v.
Elaine L. CHAO, Secretary of Labor, Defendant.
No. CIV.A. 03-2464(GK).
United States District Court, District of Columbia.
January 22, 2004.
*105 Robert M. Weinberg, Leon Dayan, Bredhoff & Kaiser, P.L.L.C., Washington, DC, for Plaintiff.
Jacqueline E. Coleman, U.S. Department of Justice, Washington, DC, for Defendant.
*106 Raymond John LaJeunesse, Jr., National Right to Work Foundation, Springfield, VA, for Movant.

MEMORANDUM OPINION
KESSLER, District Judge.
Plaintiff, the American Federation of Labor and Congress of Industrial Organizations ("Plaintiff" or "AFL-CIO")[1], brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq., for judicial review of the Final Rule entitled "Labor Organization Annual Financial Reports" ("Rule" or "Final Rule") issued by Defendant Elaine L. Chao, Secretary of Labor ("Secretary"), on October 9, 2003, 68 Fed.Reg. 58374. The Rule did not become binding until November 10, 2003, when it received final approval from the Office of Management and Budget ("OMB") pursuant to the Paperwork Reduction Act, 44 U.S.C. § 3501, et seq.[2] Plaintiff filed suit on November 26, 2003, alleging that the Secretary's action in issuing the Rule was "arbitrary and capricious." 5 U.S.C. § 706(2)(a).
This matter is before the Court for a decision on the merits.[3] Upon consideration of the entire record herein, including Defendant's Motion for Reconsideration/Clarification of the Preliminary Injunction, and for the reasons stated below, Plaintiff's request for permanent relief setting aside the Rule and enjoining its implementation is granted in part and denied in part.
In summary, the Court concludes that the Secretary has the statutory authority to issue the Rule. The Court also concludes that the Rule is reasonable, adequately explained, and not arbitrary or capricious under the APA.
The Court finds, however, that the Secretary's imposition of a January 1, 2004 effective date for the Rule is arbitrary and capricious and in violation of the APA because it gives those unions that use a fiscal year beginning January 1 less than two months to develop new accounting systems, purchase new computers and software, and train their staff, in order to comply with the new Rule. As to those unions that use a fiscal year beginning on or after July 1, however, the Court finds that the rulemaking record does not support enjoining the Rule's effective date, provided that the Department makes available a fully tested version of its electronic reporting software at least ninety dates before that July date.
Based on these findings, the Court enjoins the Secretary from imposing the Final Rule until July 1, 2004, or ninety days after the Department makes available a fully tested version of its electronic reporting software, whichever is later. The Court recognizes, as did the Government in its Motion for Reconsideration/Clarification of the Preliminary Injunction, that *107 those unions using a fiscal year that begins January 1 will not need, as a practical matter, to track the financial information required by the new Rule until January 1, 2005.

I. BACKGROUND

A. History of the Reporting Requirements
In 1959, Congress enacted the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq., ("LMRDA"), requiring unions, among other things, to file annual reports with the Secretary of Labor disclosing detailed information about their financial transactions. Congress imposed this financial reporting requirement to protect the rights of union members, to guard against corruption, and to prevent "other failures to observe high standards of responsibility and ethical conduct" in the course of labor-management activities. See 29 U.S.C. § 401(a)-(c).
Specifically, Section 201(b) of the LMRDA requires unions covered by the statute to file annually with the Secretary of Labor a financial report which accurately discloses their "financial condition and operations" for the preceding fiscal year. 29 U.S.C. § 431(b). On January 20, 1960, James Mitchell, Secretary of Labor under President Dwight D. Eisenhower, promulgated the first regulations implementing § 201(b) of the LMRDA. See 25 Fed.Reg. 433 (1960); 29 C.F.R. § 403. Those regulations, with only minor modifications, have been in place for forty-three years.
The first implementing regulations required unions with $20,000 or more in annual receipts to submit their financial report on a "Form LM-2." Smaller unions were required to submit their report on a simpler "Form LM-3." In 1962, the Department of Labor ("Department") raised the filing threshold for the Form LM-2 to $30,000; in 1981, it raised it to $100,000; and in 1994, it raised it again to $200,000. See 67 Fed.Reg. 79280, 79293 (Dec. 27, 2002). Under the $200,000 filing threshold, 79 percent of all covered unions were eligible to file the simpler Form LM-3, and only 21 percent were required to file the Form LM-2.

B. The Requirements of the Final Rule
On December 27, 2002, the Secretary issued her Notice of Proposed Rulemaking ("NPRM") initiating the formal process that resulted in the Final Rule now in issue. See 67 Fed.Reg. 79280 (Dec. 27, 2002). On October 9, 2003, approximately nine months later, the Secretary promulgated the Final Rule. See 68 Fed.Reg. 58374 (Oct. 9, 2003). As already noted, the Rule did not become binding until November 10, 2003, when it received final approval from the OMB pursuant to the Paperwork Reduction Act, 44 U.S.C. § 3501, et seq. The Final Rule provides that it will become effective January 1, 2004, a little less than two months after OMB's approval.
In promulgating the Final Rule, the Secretary used a cost-benefit analysis to determine its appropriateness. See 68 Fed. Reg. at 58409 ("the real question is whether an increase in cost, once it is accurately measured, is justified by the increased benefits to union members"). However, in response to concerns expressed by commenters on the proposed rule, the Department modified numerous provisions including, inter alia, (1) raising the Form LM-2 filing threshold from $200,000 to $250,000 in total annual receipts,[4]see id. at 58383, *108 58429; (2) setting the dollar threshold for "major" receipts and disbursements at $5,000, see id. at 58388-90; (3) making the Rule effective a little less than two months after its publication rather than, as initially proposed, immediately after publication; and (4) limiting the Form T-1 requirement to those unions that are required to file the Form LM-2.[5]
The Final Rule will apply prospectively to financial reports filed by unions using a fiscal year that begins on or after January 1. See 68 Fed.Reg. at 58374. There are 4,778 unions (about 19 percent of all unions covered under the LMRDA) that will be required to file a Form LM-2 under the new Rule. Approximately two-thirds of these unions (3,185) have fiscal years that begin on January 1. See id. at 58423; Jardine Decl., ¶ 8. The first report containing the information required under the Rule for unions using a fiscal year beginning January 1 will be due on March 31, 2005. See id. at 58413. Unions using a fiscal year that begins on a date other than January 1 will have a concomitant amount of time to comply with the Rule. See id.
A union covered by the statute must file its Form T-1, or qualifying audit in lieu of the Form T-1, simultaneously with the union's filing of its Form LM-2. See id. at 58418. The Form T-1, however, covers the trust's, not the union's, fiscal year. At the time a union files its Form LM-2, the covered union must provide a Form T-1 for the trust's most recent fiscal year that ended during the union's reporting year. See id.

1. The Form LM-2
The Rule requires unions with total annual receipts of $250,000 or more to provide an itemized accounting of all receipts, disbursements, and accounts payable and receivable in excess of $5,000 on a Form LM-2 if the receipt, disbursement, or account payable or receivable falls into one of five designated "functional" categories.[6] Unions with annual receipts of less than $250,000 are required to submit a Form LM-3. Those with annual receipts of less than $10,000 are required to submit a Form LM-4. Both the Form LM-3 and LM-4 require far less information than the Form LM-2.
Unions must file the Form LM-2 electronically. The Department is developing software that will enable each union to file its financial data electronically ("electronic reporting software"). This software, which has yet to be made available to the covered unions,[7] will be offered without charge. See 68 Fed.Reg. at 58411.

2. The Form T-1
The Final Rule requires a union to file a Form T-1 if (1) it has an interest in a trust, as defined in the LMRDA § 3(1), 29 U.S.C. § 402(1);[8] (2) the union and the *109 trust each have annual receipts of $250,000 or more; and (3) the union makes a financial contribution to the trust, or a contribution is made on the union's behalf, of $10,000 or more. If a union's financial contribution to a trust, or a contribution made on the union's behalf, is less than $10,000 or the union has an interest in a trust that has annual receipts of less than $250,000, the union only has to report on the Form LM-2 the existence of the trust and the amount of the union's contribution or the contribution made on the union's behalf. See 68 Fed.Reg. at 58430.
Unions will not have to file a Form T-1 for organizations that meet the statutory definition of a trust if (1) the trust files a report pursuant to 26 U.S.C. § 527;[9] (2) the trust files a report pursuant to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.; (3) the organization is a Political Action Committee ("PAC") and files publicly available reports with a Federal or state agency; or (4) an independent audit has been conducted in accordance with the standards prescribed in the Final Rule.[10] For the first three categories, the exception is complete, i.e., no Form T-1 is required. For the fourth category, a union must file the Form T-1, but can file the independent audit in lieu of providing the financial information otherwise required by the Form T-1. See 68 Fed.Reg. at 58413.

C. The Instant Challenge to the Final Rule
On November 26, 2003, the AFL-CIO filed the instant action seeking a Preliminary Injunction postponing the effective date of the Rule, as well as permanent relief setting aside the Rule and enjoining its implementation. On December 31, 2003, the Court granted Plaintiff's Motion for a Preliminary Injunction on the grounds that the AFL-CIO was likely to prevail on the merits of its claim that the January 1, 2004 effective date set out in the Final Rule was arbitrary and capricious. See AFL-CIO v. Chao, No. 03cv2464 (GK), 2003 WL 23104826, December 31, 2003, Mem. Op.
The AFL-CIO maintains that it is entitled to permanent relief setting aside the Rule and enjoining its implementation on two grounds. First, it claims that the Secretary lacks the statutory authority under §§ 201(b) and 208 of the LMRDA to issue the Rule, and that she is not authorized "to require labor organizations to report every receipt and disbursement, in any amount." 68 Fed.Reg. at 58376. The AFL-CIO also argues that § 208 of the statute does not authorize the Secretary to require unions to report on the finances of trusts that the union does not control.
Second, Plaintiff claims that the Secretary's action in issuing the Rule is arbitrary and capricious because (1) she set a January 1, 2004 effective date, thus giving those unions that use a fiscal year beginning *110 January 1 a little less than two months to develop the new accounting systems, purchase the new computer hardware and software, and train their staff to comply with the new Rule; (2) she underestimated the increased costs of compliance associated with the Rule; and (3) she failed to adequately explain her cost estimates.

II. STANDARD OF REVIEW
Under the APA, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard [of the APA] is a narrow standard of review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
The reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. Because the court's role is merely to ensure that the agency based its decision on relevant factors and was not a "clear error of judgment," the court may not substitute its judgment for that of the agency. Id. "It is particularly important to adhere to [this] standard when [as here,] an agency has been called upon to weigh the costs and benefits of alternative policies." Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin., 901 F.2d 107, 120 (D.C.Cir.1990). If the "agency's reasons and policy choices ... conform to `certain minimal standards of rationality' ... the [agency decision] is reasonable and must be upheld." Small Refiner Lead Phase-Down Task Force v. U.S. EPA, 705 F.2d 506, 521 (D.C.Cir.1983) (internal citation omitted); see Kisser v. Cisneros, 14 F.3d 615, 619 (D.C.Cir.1994) (noting that "[t]he court must determine whether the agency has articulated a `rational connection between the facts found and the choice made.'") (internal citation omitted). This standard presumes the validity of agency action. See Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc).
In order for agency action to survive arbitrary and capricious review under the APA, the agency must adequately explain its result. Public Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C.Cir.1993); Fed. Election Comm'n v. Rose, 806 F.2d 1081, 1088 (D.C.Cir.1986). See also Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (an agency must "provide an explanation that will enable the court to evaluate the agency's rationale at the time of the decision"); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (an agency's explanation must minimally contain "`a rational connection between the facts found and the choice made'") (internal citation omitted).
This does not mean that an agency's decision must be a model of analytical precision to survive a challenge. The extent to which an agency must explain its decision was described in City of Vernon, Cal. v. FERC, 845 F.2d 1042, 1046 (D.C.Cir.1988), where our Circuit stated:
The basis upon which an agency action is grounded must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, `We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'
Id. at 1046 (citing SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 91 *111 L.Ed. 1995 (1947) (internal citation omitted)).

III. ANALYSIS
The AFL-CIO's principal argument is that the Rule is unlawful because it is predicated on an erroneous construction of §§ 201(b) and 208 of the LMRDA. Since this case involves the question of the Secretary's interpretation of provisions of the LMRDA, the Court proceeds according to the familiar two-step inquiry of Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
Under the first step of Chevron, the reviewing court must ascertain the plain meaning of the statute. To that end, a court "must first exhaust the `traditional tools of statutory construction,' to determine whether Congress has spoken to the precise question at issue." Natural Res. Def. Council, Inc. v. Browner, 57 F.3d 1122, 1125 (D.C.Cir.1995) (quoting Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778). In particular, a court considers the text of the particular provision under examination, its statutory context, and its purpose. Consumer Electronics Ass'n v. FCC, 347 F.3d 291, 297-99 (D.C.Cir.2003); Am. Bankers Ass'n v. Nat'l Credit Union Admin., 271 F.3d 262, 265 (D.C.Cir.2001); County of Los Angeles v. Shalala, 192 F.3d 1005, 1014 (D.C.Cir.1999); Southern California Edison Co. v. FERC, 116 F.3d 507, 515 (D.C.Cir.1997). If this search yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate. See QiZhuo v. Meissner, 70 F.3d 136, 140 (D.C.Cir.1995) ("Where ... the plain language of the statute is clear, the court generally will not inquire further into its meaning.").
If, however, "the statute is silent or ambiguous with respect to the specific issue," Congress has not spoken clearly, and the court proceeds to the second step of Chevron. Chevron, 467 U.S. at 843, 104 S.Ct. 2778. "[T]he fact that the provision can support two plausible interpretations renders it ambiguous for purposes of Chevron analysis." AFL-CIO v. Fed. Election Comm'n, 333 F.3d 168, 174 (D.C.Cir.2003). At that stage, a permissible agency interpretation of the statute merits judicial deference. Id. Specifically, the issue is "(1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation for other reasons, exceeds the bounds of the permissible." Barnhart v. Walton, 535 U.S. 212, 218, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

A. Section 201(b) of the LMRDA Authorizes the Secretary to Require Itemized Reporting
Plaintiff asserts that the plain meaning of § 201(b) of the LMRDA prohibits the Secretary from requiring unions "to report every receipt and disbursement, in any amount, and in any categories prescribed by the Secretary." 68 Fed.Reg. at 58376. Specifically, Plaintiff maintains that the Secretary's interpretation of the statute fails at Chevron step one because it is contrary to (1) the text of § 201(b) of the LMRDA; (2) the statute's legislative history; (3) the longstanding administrative construction of § 201(b); and (4) § 201(c) of the statute.

1. The Text of § 201(b)
The first "traditional tool of statutory construction" is always examination of the text of the statute. Section 201(b) provides in full:
Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing *112 the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year
(1) assets and liabilities at the beginning and end of the fiscal year;
(2) receipts of any kind and the sources thereof;
(3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;
(4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;
(5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and
(6) other disbursements made by it including the purposes thereof
all in such categories as the Secretary may prescribe.
29 U.S.C. § 431(b) (emphasis added).
The plain language of § 201(b) shows clearly that Congress gave the Secretary broad authority to require the filing of financial reports. It also shows that Congress delegated to the Secretary the exclusive authority to determine the level of "detail as may be necessary" for accurate disclosures. 29 U.S.C. § 431(b). Thus, on its face, § 201(b) vests the Secretary with the discretion to determine "the format in which the information required by the statute must be provided, as well as the detail in which the information must be reported." 68 Fed.Reg. at 58376.
Plaintiff contends that the statutory terms "financial condition" and "operations" are terms of art in the field of accounting and, in accounting parlance, mean "balance sheet" and "income statement," respectively. It asserts that, in the field of accounting, both a balance sheet and an income statement "are documents that are characterized by the aggregation of the information being reported into appropriate homogenous categories and not by lengthy itemized lists of numerous individual receipts, disbursements, assets, or liabilities." Pl.'s Mot., at 12. It argues that, since Congress has "deliberately" chosen to invoke these terms of art, § 201(b) "cannot plausibly be construed to denote itemized disclosure of the entity's ordinary assets, liabilities, receipts, or disbursements." Id. at 13.
Instead, Plaintiff claims that the LMRDA authorizes the Secretary to develop and require the filing of only one kind of financial report:
an annual report of the type regularly prepared by corporations and nonprofit entities that consists of a statement of assets and liabilities aggregated into categories (in the nature of a balance sheet) and a statement of receipts and disbursements aggregated into categories (in the nature of an income statement) with the Secretary to prescribe the categories.
Id. at 8. Plaintiff asserts that the only matters as to which the statute requires additional disclosure are found in subsections (3), (4), and (5) of § 201(b).
Plaintiff's emphasis on two discrete phrases in § 201(b), "financial condition" *113 and "operations," is unpersuasive. Section 201(b) does not require unions to file statements of "financial condition and operations." Rather, it requires unions to file "a financial report" which contains "information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year." 29 U.S.C. § 431(b). The phrase "financial condition and operations" does not modify the term "financial report"; it pertains to the word "information." It establishes a baseline of detail that a union must disclose, at a minimum, about "the following information"i.e., the items listed in subsections (1)-(6) of § 201(b). Moreover, Plaintiff has cited no legislative history whatsoever to support its claim that Congress intended these two phrases to have specialized meaning.
Thus, given the plain language of § 201(b), the AFL-CIO's assertion that "financial condition" and "operations" are accounting terms of art which prohibit itemized disclosure is irrelevant because the statute requires neither a statement of "financial condition" nor a statement of "operations." Rather, it requires unions to file a "financial report," and that term clearly encompasses itemized disclosure.[11]
Moreover, "the Supreme Court has cautioned lower courts to be especially leery of interpreting the LMRDA based on uncertain inferences from word-by-word parsing of the statute." Mallick v. Int'l Bhd. of Electrical Workers, 749 F.2d 771, 776 (D.C.Cir.1984) ("Mallick I") (citing to United Steelworkers v. Sadlowski, 457 U.S. 102, 111, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982)). Instead, the Supreme Court has instructed lower courts to "look to the objectives Congress sought to achieve, and avoid placing great emphasis upon close construction of the words." Sadlowski, 457 U.S. at 111, 102 S.Ct. 2339. See Smith v. McCarthy, 723 F.Supp. 173, 174-75 (D.D.C.1989) (citing Sadlowski for the same proposition). Given that the legislative history of the LMRDA reveals "a widespread congressional concern for disclosure of union information to the rank and file in order to prevent autocratic rule," McCarthy, 723 F.Supp. at 175, Plaintiff's textual analysis of § 201(b) is unpersuasive.
The Court turns now to examine that legislative history.

2. Congressional Purpose
The AFL-CIO claims that the legislative history of the LMRDA and its predecessor the Taft-Hartley Act, as well as the long-standing administrative construction of § 201(b), support its position that the statute prohibits the Secretary from requiring itemized disclosure.
The LMRDA was enacted after lengthy congressional investigations by the Senate Select Committee on Improper Activities in the Labor or Management Field ("McClellan Committee") revealed that many union officials were running their unions "as private fiefdoms" without regard to member interests. Mallick I, 749 F.2d at 776. See Finnegan v. Leu, 456 U.S. 431, 435, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982) (noting that the LMRDA was "the product of congressional concern with widespread abuses of power by union leadership"). Congress passed the LMRDA because it believed that "the exposure to public scrutiny of all vital information concerning the operation of a trade union will help deter repetition of the financial abuses *114 disclosed by the McClellan committee." Senate Comm. on Labor and Public Welfare, Labor-Management Reporting and Disclosure Act of 1959, S.Rep. No. 86-187, at 9, reprinted in 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 405 (1959) ("NLRB LMRDA History").
In Mallick I, this Circuit noted the significance of the following general principles, articulated in the House Report accompanying the bill that was eventually enacted as the LMRDA, in interpreting and construing the statute and its subsections:
The members of a labor organization are the real owners of the money and property of such organizations and are entitled to a full accounting of all transactions involving such money and property. Because union funds belong to the members they should be expended only in furtherance of their common interest. A union treasury should not be managed as though it were the private property of the union officers, however well intentioned such officers might be, but as a fund governed by fiduciary standards.... It is the purpose of this bill to insure that full information concerning the financial and internal administrative practices and procedures of labor organizations shall be, in the first instance, available to the members of such organizations.
Mallick I, 749 F.2d at 779-80 (citing House Comm. on Education and Labor, Labor-Management Reporting and Disclosure Act of 1959, H.R.Rep. No. 86-741, at 7, reprinted in NLRB LMRDA History, at 765-66).
The legislative history of the LMRDA makes clear that Congress' goal in passing the statute was to root out and expose corruption in unions and to promote accountable financial stewardship. Full disclosure of detailed information about the financial transactions ordered by union officials is a necessity for achieving that goal. "[O]nly full disclosure will enable the persons whose rights are affected, the public and the Government[,] to determine whether [such] arrangements or activities are justifiable, ethical, and legal." NLRB LMRDA History, at 401. Accordingly, where the legislative purpose of the LMRDA reinforces the plain language of § 201(b), it is clear that Congress vested the Secretary with the authority to require itemized disclosure.
In further support of its position, Plaintiff argues that the statute was intended simply to incorporate the financial disclosure requirements of the Taft-Hartley Act.[12] As discussed above, however, the LMRDA was enacted after a lengthy congressional investigation disclosed serious instances of corruption in labor unions. See Mallick I, 749 F.2d at 776. Clearly, then, far from incorporating the provisions of the then-existing Taft-Harley Act which had proved ineffective in stopping union corruption, Congress intended to effect substantial changes by significantly strengthening the existing financial reporting rules for unions. Thus, given the LMRDA's legislative history, Plaintiff's contention that the statute simply incorporated the Tart-Harley Act disclosure requirements cannot be credited.
Finally, Plaintiff argues that the Final Rule is unauthorized because it differs from the longstanding administrative construction of § 201(b). It is well established, however, that "changed circumstances *115 may justify the revision of regulatory standards over time." Farmers Union Cent. Exch. v. Fed. Energy Reg. Comm'n, 734 F.2d 1486, 1500 (D.C.Cir.1984). See People of State of California v. Fed. Communications Comm'n, 905 F.2d 1217, 1230 (9th Cir. 1990) (recognizing that an agency is "obligated to reevaluate its policies when circumstances affecting its rulemaking proceedings change"). This is especially so where, as here, the rulemaking record substantially documents the Secretary's reasons in support of the particular changes finally adopted. See infra II. C.1 & 2. See also Nat'l Classification Comm. v. U.S., 779 F.2d 687, 696 (D.C.Cir.1985) ("It is well settled that an agency may depart from past policies or practices if the agency also provides a reasoned explanation for its actions."). Thus, Plaintiff's argument that the Final Rule is unlawful simply because the financial disclosure rules for unions have remained largely unchanged since 1959 is unpersuasive.

3. Statutory Context
The AFL-CIO claims that the Secretary's interpretation of § 201(b) conflicts with § 201(c), 29 U.S.C. § 431(c), which governs access by union members to their union's "books, records, and accounts." Section 201(c) provides that any union required to submit an annual financial report must "make available the information required to be contained in such report to all of its members ... to permit such member for just cause to examine any books, records, and accounts necessary to verify such report." 29 U.S.C. § 431(c). Plaintiff argues that, when § 201(b) and § 201(c) are read together, the Secretary's interpretation of subsection (b) is "irrational" because it gives her the authority to require the disclosure of financial information "to the general public that even a union member cannot obtain absent a showing of `just cause.'" Pl.'s Mot., at 22.
Plaintiff's argument is unconvincing because, as the Secretary points out in the Final Rule, while the revised Form LM-2 calls for more detail than the previous form, it does not require disclosure of the underlying records necessary to verify the report. See 68 Fed.Reg. 58377. The Secretary explains that the `just cause' requirement of § 201(c) has not changed simply because she "exercised her authority to determine that more detailed financial information should be reported on a Form LM-2 than previously." Id. Accordingly, Plaintiff's claim that the Secretary's interpretation of § 201(b) undercuts § 201(c) must be rejected.
Moreover, our Circuit has adopted a broad enough reading of the § 201(c) standard that the Secretary's interpretation of § 201(b) does not undercut § 201(c). Our Court of Appeals has held that:
a union member has `just cause' to examine union records relating to `a sudden, apparently significant, and unexplained change in an item on his union's LM-2 reports,' unless the union can demonstrate that the disclosure of this information will cause the union a `genuine harm' that `outweighs the strong policy favoring access for union members who have otherwise satisfied the statutory requirement for examination.'
Mallick v. Int'l Bhd. of Electrical Workers, 814 F.2d 674, (D.C.Cir.1987) ("Mallick II") (citing Mallick I, 749 F.2d at 781).[13]
*116 In support of its broad reading of § 201(c), this Circuit noted that "[i]n our view, it would be strange if subsection 201(c)a provision evincing special concern with the disclosure of financial information were read as narrowly limiting the general fiduciary principles that govern other aspects of the financial relationship between union officials and union members." Mallick I, 749 F.2d at 780-81. It also noted that cases interpreting the `just cause' standard "have generally rejected a cramped literalism." Id. at 781.[14] Thus, given the relatively broad reading of the "just cause" standard articulated in Mallick I and then affirmed in Mallick II, Plaintiff's claim that the Secretary's interpretation of § 201(b) conflicts with § 201(c) lacks merit.

B. Section 208 of the LMRDA Authorizes the Secretary to Require Unions to Report on the Finances of Independent Trusts
The Secretary cites to § 208 of the LMRDA as the statutory provision authorizing her to require the Form T-1. Section 208 provides that the Secretary may, in addition to issuing rules and regulations "prescribing the form and publication of reports required to be filed under this subchapter," issue "such other reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as [s]he may find necessary to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438. As already noted, a "trust in which a labor organization is interested" is defined in LMRDA § 3(1) as a
trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.
29 U.S.C. § 402(1).
Plaintiff asserts that the Secretary is not authorized under § 208 of the LMRDA to require unions to report on the finances of independent trusts because she has failed to adequately explain how the Form T-1 is "necessary to prevent the circumvention or evasion of [the LMRDA] reporting requirements." Plaintiff also contends that, if a union fails to exact the required financial information from a trust (or other covered entity) which has no independent legal duty to comply with the LMRDA reporting requirements, the new Form T-1 and the availability of criminal penalties for violating the filing requirements of the LMRDA, see 29 U.S.C. § 439,[15] put that union and its officers at risk "of being held *117 criminally responsible for violating a duty they have no power to fulfill." Pl.'s Mot., at 26. Plaintiff also maintains that the Form T-1 imposes requirements that conflict with federal and common-law fiduciary duties, namely, forcing a union officer who is also a trustee of an independent trust to "make a Hobson's choice" between "the union's interest in avoiding criminal sanction" and "the trust's interest in being free from onerous reporting and itemization requirements." Pl.'s Mot., at 29.

1. The Secretary Adequately Explained Her Determination that the Form T-1 Is Necessary to Prevent Circumvention of the LMRDA Reporting Requirements
Plaintiff asserts that the Secretary is not authorized under § 208 of the LMRDA to require unions to report on the finances of independent trusts because she has failed to adequately explain how the Form T-1 is "necessary to prevent the circumvention or evasion of [the LMRDA] reporting requirements." Specifically, Plaintiff argues that "it is impossible to see how a requirement that unions file the new Form T-1 for trusts that the unions neither control nor finance serves `to prevent the circumvention or evasion of [any union] reporting requirement in the LMRDA.'" Pl.'s Reply, at 17. Plaintiff's argument ignores the rulemaking record data.
In the NPRM, the Secretary found that, because of the growth in the size and complexity of unions' financial dealings since the enactment of the LMRDA in 1959, unions today "have substantial financial dealings with, or through, funds or organizations that are not wholly owned" by the unions. The Secretary explained that
[t]hese separate organizations pose the same transparency challenges as `off-the-books' accounting procedures in the corporate setting: large-scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations.
67 Fed.Reg. at 79282.
The Secretary noted that if a union transfers funds to another organization, but fails to disclose disbursements made by that organization, "union members may have no way to determine whether the funds in question were actually spent for the benefit of members." Id.
The Secretary pointed out several examples of situations in which, because of inadequate financial disclosure, it was "impossible for union members to assess these trusts and fully exercise their self-governing democratic membership rights." Id. at 79283. The Secretary first noted that the Department's reports indicate that "joint training funds have been used to pay union officials supplementary salaries or host extravagant parties for trustees." Id.
*118 The Secretary also pointed out that investigations by the Office of Labor Management Standards ("OLMS") revealed the following problematic situations. In one instance, OLMS found that twenty-nine local unions had contributed an average of $62,000 per month to a statewide strike fund. None of the twenty-nine local unions were required to report the disbursements made by that fund, however, because no single union owned the fund. Id. In another instance, the investigations revealed that a local union held 97 percent of its funds on deposit at a credit union. That credit union made 61 percent of its loans (many of which were near $20,000) to four credit union loan officers, three of whom were officers of the local union. The members of the local union had no ready access to information about those loans because the local union did not wholly own the credit union. Id.
Based on the rulemaking record data, the Secretary concluded that the new Form T-1 would "substantially improve transparency of significant organizations that are financially connected to reporting labor organizations" and thus "provide union members, the public, and the government the information they need to properly ensure union democracy, fiscal integrity and transparency in a manner consistent with the intent of Congress in enacting the LMRDA." Id.
Thus, Plaintiff's claim that the Secretary failed to adequately explain how the Form T-1 is "necessary to prevent the circumvention or evasion of [the LMRDA] reporting requirements" is unpersuasive. A reviewing court will uphold an agency's determination if the agency provides "an explanation that will enable the court to evaluate the agency's rationale at the time of the decision." Pension Ben. Guar. Corp., 496 U.S. at 654, 110 S.Ct. 2668. In the instant case, the rulemaking record shows clearly that the Secretary explained, in great detail, her determination that the Form T-1 is necessary to prevent the circumvention of the LMRDA reporting requirements.

2. The Possible Use of Criminal Penalties Does Not Invalidate the Form T-1
Plaintiff contends that the trust disclosure rules are invalid because they might subject to criminal penalties unions that cannot induce an independent trust to provide the necessary financial disclosures. This argument lacks force because, under the plain language of 29 U.S.C. § 439, a union is subject to criminal sanction only if that union "willfully violates" the LMRDA reporting requirements. 29 U.S.C. § 439. Thus, so long as a union makes a good faith effort to persuade the trust to provide the necessary information, it has no reason to fear criminal sanction.
Moreover, the Secretary explicitly responded to this criticism and explained that the Department did not intend to impose criminal penalties on union officials who were unable to comply, despite their good faith efforts to obtain the necessary information:
The Department recognizes that there may be some instances in which a trust will not fully cooperate in providing timely information to the reporting union. However, the Department expects that, in those infrequent instances, the reporting union officials will be able to demonstrate that they made a good-faith effort to obtain timely information from the trust. In such situations, the Department is prepared to exercise any available investigative and other authority to assist the reporting union to obtain the necessary information.
68 Fed.Reg. at 58418 (emphasis added).
Finally, the trust disclosure rules are not so onerous that trusts would, at least *119 in general, be unwilling or unable to voluntarily provide the necessary information. A union may choose to meet the trust disclosure requirement by submitting any one of the following: (1) a statement that a qualifying report has been filed with a separate government agency; (2) a copy of a qualifying independent audit; or (3) a completed Form T-1. See id. at 58414. Moreover, the Final Rule exempts from the trust reporting requirement those unions that are eligible to file the Form LM-3 and LM-4, i.e., 81 percent of all unions covered by the LMRDA. See id. at 58413. In addition, "there has been no suggestion that covered trusts are ill equipped to comply with the bookkeeping or reporting requirements established by the final rule." Id. at 58416.
Thus, for the above-stated reasons, Plaintiff's contention that the trust disclosure rules are unlawful because they might subject to criminal penalties unions that cannot induce a trust to provide the necessary financial disclosures must be rejected.

3. Fiduciary Duties
Plaintiff maintains that the Form T-1 imposes requirements that conflict with federal and common-law fiduciary duties. However, as explained above, the trust disclosure rules are not so onerous that trusts would, at least in general, be unwilling or unable to voluntarily provide the necessary information.

C. The Rule Is Reasonable, Adequately Explained, and Not Arbitrary or Capricious; the Choice of a January 1, 2004 Effective Date Is Arbitrary and Capricious

1. The Rulemaking Process
On December 27, 2002, the Secretary issued her NPRM initiating the formal process that resulted in the Final Rule now in issue. See 67 Fed.Reg. 79280 (Dec. 27, 2002).
The NPRM described the increasing trend away from small, independent unions and toward larger unions that tend to resemble modern corporations in their structure and complexity. The NPRM noted that these large unions often
manage full-featured benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, offer multiple compensation opportunities to their senior executives and officials, operate revenue-producing subsidiaries, conduct extensive government lobbying, and participate in foundations and charitable activities.
67 Fed.Reg. at 79280.
The Secretary determined that, despite these operational and structural changes in the nature of unions, the forms on which the unions reported financial transactions remained essentially unchanged and were a barrier to full and transparent reporting. See id. In particular, she noted that the forms allowed the reporting of "large expenditures for generalized purposes" without providing any detail. Id. at 79281. "Recent form LM-2 reports filed with the Department disclosed, for example, expenditures of $7,805,827 for `Civic Organizations,' and $3,927,968 for `Sundry Expenses,' and $7,863,527 for `Political Education.'" Id.
The Secretary observed that "the current [Form LM-2] does not require the union to disclose the identity of the recipient of the funds, making it difficult to determine whether these amounts were actually spent for the described activities," and difficult for union members to know *120 "whether or not their dues were spent appropriately." Id. at 79282. The Secretary also noted that OLMS investigations revealed that the "broad aggregated categories on the existing forms made it possible to hide embezzlements, self-dealing, overspending and financial mismanagement." Id.[16] She also found that similar problems surrounded "trust[s] in which a labor organization is interested," as defined in § 3(1) of the LMRDA. See supra I.B.1.
These considerations prompted the Secretary to conclude that the current forms no longer serve the underlying purpose of the LMRDA financial reporting requirements, namely, to provide union members with "`all the vital information necessary for them to take effective action in regulating affairs of their organization.'" 68 Fed. Reg. at 58380 (internal citation omitted).
The Secretary reasoned that by "increas[ing] the transparency of union financial reporting," the proposed rule would correct the deficiencies of the existing LMRDA disclosure forms. See id. at 58420. Specifically, she explained that the increased detail required under the proposed rule would "enable workers to be responsible, informed, and effective participants in the governance of their unions; discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by OLMS." Id.
The proposed rule mandated, among other things, (1) that receipts, disbursements, and accounts payable and receivable in excess of a threshold amount be individually reported on the Form LM-2; (2) that all such expenditures be reported in new designated "functional" categories; (3) that unions estimate and report on the Form LM-2 the time each officer and member spends on activities corresponding to the functional categories; (4) that unions report the number of members in specific categories; (5) that unions report the assets, liabilities, receipts, and disbursements of all "significant trusts" in which they have an interest on the Form T-1; and (6) that unions file the Form LM-2 electronically.
At the outset of the rulemaking process, the Secretary acknowledged that additional burdens would be imposed on unions by the new reporting requirements. In weighing the burden that the changes would entail, she noted that she would rely primarily on data provided by affected parties. "Information regarding the burden imposed by making the proposed changes and the benefit to be gained is most likely to be obtained by proposing the changes for comment so that unions who file these reports, union members, and other groups that represent workers can express their views." See 67 Fed.Reg. at 79282.
During the ninety-day comment period, the Secretary received over 35,000 comments.[17] Although a majority of these comments were form letters, approximately 1,200 individualized comments were received from union members, unions, employers and trade organizations, public interest groups, accountants and accounting firms, academics, and members of Congress.
The Secretary relied primarily upon the lengthy, substantive, and detailed empirical analyses she received from the AFL- *121 CIO and SRA International, a professional provider of information technology services contracted for by the Department.
The AFL-CIO's study of the burdens of the proposed rule was prepared by economist Ruth Ruttenberg ("Ruttenberg Report"). See Pl.'s Ex. 3, Tab A. The Ruttenberg Report concluded that the Secretary's initial $14.7 million estimate of the economic burden that the proposed rule would place on reporting unions was too low. See id., at 4. It estimated, using median-per-union cost figures, that the total costs of implementing the new Form LM-2 electronic filing system for AFL-CIO affiliates would be approximately $712 million. This figure did not include either the compliance costs attributable to the Form LM-2 filers which are not AFL-CIO affiliates, or the costs of completing other proposed reporting forms, such as the Form T-1 for "significant trusts." Id. at 31.
The Ruttenberg Report also addressed the issue of the lead time needed for compliance, concluding that, depending on the size and resources of the union, unions would require between six months and one year before the beginning of the first reporting period to which the Rule would apply to adjust their accounting and information technology systems in order to accurately collect and record the mandated new information. See id. at 18.
The SRA study assessed the technical feasibility of electronically collecting and reporting the information that would be required by the proposed changes and concluded that the proposed rule could be implemented "with relative ease." 68 Fed. Reg. at 58408.
In calculating the burdens of the Rule, the Secretary first identified both the one-time and recurring tasks reporting unions would be required to perform to comply with it. Second, she estimated (1) the hours required to perform the tasks she had identified ("burden hours"); (2) the cost of the labor to perform those tasks (hourly cost of labor × burden hours); and (3) the cost of the capital equipment (hardware and software) needed to comply with the Rule. Third, she added these three burden hour estimates to arrive at a total estimated cost associated with the Rule.
In the NPRM, the Secretary estimated 1 burden hour per union or $14.6 million as the baseline burden in the first reporting year. See 67 Fed.Reg. at 29293-97. This baseline burden represented, "what the Department believed was the accepted burden associated with the current Form LM-2, as reflected in the Department's numerous, unchallenged submissions to OMB in obtaining OMB's approval to continue using the form." 68 Fed.Reg. at 58432.

2. The Final Rule
In the Final Rule, the Secretary revised and increased her 1 hour, $14.6 million baseline burden hour estimate to over 300 hours and almost $80 million. See 68 Fed. Reg. at 58439. The Secretary changed her baseline burden hour estimate in response to the various comments she received (including comments from Plaintiff), as well as the rest of the rulemaking record, in order to "improve the estimate of the additional time and cost involved in filing the revised form." See id. at 58386.

a. The Secretary's Electronic Filing Burden Hour Estimate
In assessing the cost and time involved in converting to an electronic filing system, the Secretary estimated 27.9 burden hours for unions to develop, test, and review special software ("translator software") that allows unions to convert (or *122 "translate") its financial data into a form supported by the Department's electronic reporting software. The Secretary also estimated 8.9 burden hours for unions to set-up and install the Department's electronic reporting software.[18]See id. at 58439 (Table 4).
The Secretary based her electronic filing burden hour estimate on the SRA study as well as "the expertise of investigators with first-hand knowledge of union financial reporting," "the Department's review of a variety of accounting software packages, its evaluation of the recordkeeping requirements of the current Form LM-2, and its review of the public comments." Id. at 58437.
She also pointed out that the electronic filing requirement applies only to those unions that have $250,000 or more in annual receipts. This means that 81 percent of all unions covered under the LMRDA are not subject to the electronic filing requirement. See 68 Fed.Reg. at 58408. The Secretary also noted that raising the Form LM-2 filing threshold to $250,000 enabled 501 more unions, i.e., some of the smallest filers that are most likely to have hardware and/or software problems, to file the far less burdensome Form LM-3. See id. at 58409.
The AFL-CIO's own Beaconfire Report estimated that the burden hours associated with developing translator software would range from 74 hours for smaller unions to up to 256 hours for larger unions. Pl.'s Mot., at 36. However, the Secretary explained at length and in great detail why she did not attach greater weight to this report. First, she noted that it
assumed, without explanation, that the average data file to be transmitted by unions to the Department will be substantially larger than the size assumed by SRA. SRA, by contrast, stated that it extrapolated file size requirements based on the data types and volume currently being reported on Form LM-2, taking into account the fact that data volume varies significantly from union to union.
68 Fed.Reg. at 58408.
Second, she reasoned that it "fails to recognize that the information required by the new Form LM-2 is not structurally complex or fundamentally different from the information that has been reported on the current form." Id. Third, she pointed out that it "acknowledges that [its] figures, like those developed by SRA, are merely estimates." Id.

b. The Secretary's Labor Cost Estimate
The Secretary explained that her analysis of labor costs was designed "to provide estimates for a `representative' union," and thus, that her "estimates largely reflect weighted averages." 68 Fed.Reg. at 58433. She pointed out that "unions will rely upon the services of some or all of the following positions (either internal or external staff, including union president, union secretary-treasurer, accountant, bookkeeper, computer programmer, lawyer, consultant)" in implementing the requirements of the new rule. Id.
*123 She noted that, "[s]ince the AFL-CIO did not include estimates for consulting, accounting, legal, or similar costs, the Department had to assume additional hours for these activities in order to arrive at a weighted average for computing a total burden estimate" for Form LM-2 filers. Id. at 58432. The wage rates that she used to determine the cost of such services were averages of "wage rates and employer costs published by the Bureau of Labor Statistics or derived from data reported in [recently filed LM-2's]." Id. at 58433, 58445.

c. The Secretary's Capital Cost Estimate
The Secretary estimated that "LM-2 filers will spend an average of nearly $1,000 for computer hardware, hardware upgrades, accounting software, and software upgrades...." 68 Fed.Reg. at 58436. She explained that these estimates "are weighted averages of $1,500 for computer hardware and $250 for accounting software across all LM-2 filers." Id. She noted that, in arriving at these estimates, she "assumed that most of the computer equipment and software would be purchased for normal business operations," an assumption informed by data suggesting that unions commonly used commercial off-the-shelf software packages to maintain their finances and prepare financial reports. Id. at 58433.
Information submitted by the AFL-CIO suggested that
79% of national and international unions and 67% of local unions will not need any new computer hardware; 38% of national and international unions and 25% of local unions will not need any new or upgraded computer software; and 86% can expand their current accounting systems to include the additional fields to accommodate functional reporting.
Id. at 58409.

d. The Rule's Effective Date
The Secretary set a January 1, 2004 effective date, thus giving those unions that use a fiscal year beginning January 1 a little less than two months to develop the new accounting systems, purchase the new computers and software, and train their staff to comply with the new Rule. Unions using a fiscal year that begins on a date other than January 1 will have a concomitant amount of time to comply with the Rule. See id. at 58413. The Secretary stated that, in setting the January 1, 2004 date, "[t]he aim of the Department is to balance some reasonable amount of time that the unions will need to adapt to the new reporting requirement and the members' immediate interest in knowing how their dues money is spent." 68 Fed.Reg. at 58411.
In support of her imposition of the January 1, 2004 effective date, the Secretary noted that (1) "unions must already track and maintain records for all disbursements in order to report total disbursements for the variety of functional categories on the current Form LM-2," id. at 58421; and (2) "[t]he public comments and OLMS auditing and accounting experience confirm that many local ... unions already collect and maintain some ... of the information required by the new form." Id.
Most of the relevant testimony, however, recommended a significantly longer grace period than the Secretary allowed. "Several unions suggested that the effective date be delayed six months to two years." 68 Fed.Reg. at 58410-11. Some commenters pointed out that, "given the Department's experience with e.LORS and the SEC's experience with its reporting system, a delay of two to four years before *124 full implementation was more realistic."[19]Id. Other commenters suggested "that the Department's software be subject to a separate review and comment process after it is issued." Id. The Secretary received no comments in opposition to the Rule's January 1, 2004 effective date that differentiated between unions using a fiscal year beginning January 1 and those using a fiscal year beginning on or after July 1.

3. Substantial Evidence in the Rulemaking Record Supports the Secretary's Cost of Compliance Estimates and the Secretary Has Adequately Explained Those Estimates
The AFL-CIO claims that the Secretary's action in issuing the Rule is arbitrary and capricious because (1) she underestimated the increased costs of compliance associated with the Rule;[20] (2) she failed to adequately explain those cost estimates; and (3) she set a January 1, 2004 effective date, thus giving those unions that use a fiscal year beginning January 1 a little less than two months to develop the new accounting systems, purchase the new computers and software, and train their staff to comply with the new Rule.
Defendant maintains that the rulemaking record shows that the Secretary's methodology for evaluating the relevant costs of the Rule and adjusting those cost estimates as needed to incorporate comments and data received during the comment period was reasonable, within her discretion, and adequately explained. Defendant also maintains that the Secretary's imposition of the January 1, 2004 effective date was not arbitrary and capricious.
The APA requires a reviewing court to examine the rulemaking record to ensure that the agency has "identified all relevant issues, [given] them thoughtful consideration duly attentive to comments received, and formulated a judgment which rationally accommodates the facts capable of ascertainment and the policies slated for effectuation." Telocator Network of America v. FCC, 691 F.2d 525, 545 (D.C.Cir.1982). "The ultimate standard of review governing this ... inquiry is a narrow one: the court is not permitted to substitute its judgment for that of the agency." U.S. Lines v. Fed. Maritime Comm'n, 584 F.2d 519, 526 (D.C.Cir.1978). In the instant case, the rulemaking record demonstrates that the Secretary's cost of compliance estimates were the product of reasoned decisionmaking and that she adequately explained her estimates.
First, both the NPRM and the Final Rule provided lengthy, technical explanations for the Rule and demonstrate that the Secretary gave serious consideration to the relevant record data. In a number of instances, the Secretary either adopted the estimates provided by the AFL-CIO or other commenters, or revised her estimates based on comments and data received during the comment period. See 68 Fed.Reg. at 58432 ("The Department used the AFL-CIO and other commenters' estimates when they provided information that the Department did not have and that increased the accuracy of its estimates by adding to the Department's own data and auditing experience.").
*125 For example, the Secretary relied upon the AFL-CIO's survey data to support its conclusion that "many unions already maintain their records and accounting systems in ways that are readily compatible with the requirements of the final rule." The AFL-CIO survey data suggested that:
59% of national and international unions record expenses by type of activity or functional category; 62% of unions can generate the required itemization detail; 86% of unions do not have trouble downloading information from their account systems into a spreadsheet; 40% of national and international unions have a system of accounts receivable that is immediately compatible with the final rule; and 66% of national and international unions have a system of accounts payable that is immediately compatible with the final rule.
68 Fed.Reg. at 58385.
In some cases, the Secretary considered certain of Plaintiff's estimates in light of other available data and the Department's expertise, and then determined that other record data were more reliable. See e.g., 68 Fed.Reg. at 58408 ("The AFL-CIO figures ... indicating that far fewer labor organizations use [the Department's electronic-filing] software, cannot refute the Department's actual usage data."); id. (explaining, at length, the Secretary's reasons for not attaching greater weight to the AFL-CIO's Beaconfire Report); id. at 58426 (noting that the AFL-CIO survey is "open to question" because the "Department's own experience, based on years of reviewing union records in audits and investigations, suggests that the AFL-CIO estimates of costs are more likely to be too high than too low").
The Secretary did not act arbitrarily and capriciously simply because she did not adopt wholesale the conclusions of studies submitted by Plaintiff. See Nat'l Min. Ass'n v. Mine Safety and Health Admin., 116 F.3d 520, 549 (D.C.Cir.1997) (holding that the agency did not act arbitrarily and capriciously "simply by failing to adopt the Union's recommendations"). When agencies are evaluating data within their technical expertise, reviewing courts generally give them an "extreme degree of deference." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This is because "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." Id.
Second, the Final Rule was largely devoted to answering the many objections raised by Plaintiff during the comment period. The APA requires an agency to respond to "relevant" and "significant" public comments, i.e., comments which "raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule." Home Box Office, Inc. v. FCC, 567 F.2d 9, 35-36 & n. 58 (D.C.Cir.1977).
The rulemaking record demonstrates that the Secretary responded to all of the significant challenges presented by Plaintiff's comments and engaged in a careful and reasoned consideration of the problems presented therein. In Part II of the statement of basis and purpose, the Secretary responded in great detail to Plaintiff's claim that she lacked the statutory authority under §§ 201(b) and 208 of the LMRDA to issue the Rule. See 68 Fed. Reg. at 58376-77. In Part III, she addressed at length Plaintiff's claim that she underestimated the cost and time involved in converting to an electronic filing system. See id. at 58407-10. In Part V, she outlined in great detail Plaintiff's claim that her burden hour estimates were flawed. She then reviewed the record data she had relied on and explained the methodology *126 she used to reach her burden estimates. See id. at 58431-41. The rulemaking record thus shows clearly that the Department met its obligation to "examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. 2856.
Third, the rulemaking record demonstrates that the Secretary carefully weighed the costs (both one-time and recurring) and benefits of the Rule and concluded "on balance, that technological advances have made it possible to provide the level of detail necessary for union members to have a more accurate picture of their union's financial condition and operations without imposing an unwarranted burden on reporting unions." 68 Fed.Reg. at 58409.
The Secretary explained that her calculus of the costs and benefits of the Rule were based, in significant part, "on the value of transparency and accountability in union financial affairs as well as on very difficult projections regarding the impact of the accessibility of financial information on sound union financial management and union democracy generally." Id. at 58419. Specifically, she concluded that the Final Rule
directly benefits union members because disclosure permits members to make better decisions about union governance and helps deter and detect fraud. The public also benefits from the deterrence of fraud, due to the costs fraud imposes on, for example, the criminal justice system, and from the promotion of ethical conduct in the administration of labor organization affairs, which increases the stability of labor organizations, and thus promotes the flow of commerce.
68 Fed.Reg. at 58381.
In summary, the Secretary's explanation, taken as a whole, demonstrates that she examined the data, considered the relevant factors, and made a reasoned judgment based on the record. Accordingly, the Secretary's cost of compliance estimates and her explanation pass muster under the APA.

4. The Secretary's Choice of a January 1, 2004 Effective Date Is Arbitrary and Capricious
In this case, the Secretary set a January 1, 2004 effective date, thus giving those unions that use a fiscal year beginning January 1 a little less than two months to develop the new accounting systems, purchase the new computers and software, and train their staff to comply with the new Rule. Unions using a fiscal year that begins on a date other than January 1 will have a concomitant amount of time to comply with the Rule. 68 Fed. Reg. at 58413. The Secretary acknowledges that "some interim period will be needed for unions to adapt their recordkeeping systems to the new requirements," 68 Fed.Reg. at 58411, and that "filers will need to study and understand the new requirements, make adjustments to the union's recordkeeping system, and train staff." Id. She claims that the January 1, 2004 effective date allows all unions, including those using a fiscal year that begins January 1, "adequate time to conform their accounting systems to the revised forms before the start of the first reporting period for which they will be required to report on the new Form LM-2 (no earlier than January 1, 2004)." 68 Fed.Reg. at 58437. For a number of reasons, the Court concludes that the Secretary's reasoning does not withstand close analysis.
First, the majority of the comments specifically dealing with the Rule's January 1, 2004 effective date opposed it, saying that it was too soon and that the effective date should be delayed six months to two years. *127 Many of the commenters also argued that the Final Rule should not be imposed until the Department's electronic reporting software had been tested and implemented, and was deemed fully operational. See id. at 58410-11.
The AFL-CIO also submitted a lengthy declaration from Linda Jardine, a Certified Public Accountant ("CPA"), in support of its Motion for a Preliminary Injunction. Jardine concluded that a January 1, 2004 effective date was too soon because "most unions will have to extensively or significantly revise their accounting systems." Id., ¶ 35. In reaching this conclusion, Jardine did not differentiate between unions using a fiscal year beginning January 1 and those using a fiscal year beginning on or after July 1. She explained that revisions to an accounting system of the sort necessitated by the Final Rule "require special training and supervision of all personnel with responsibility for processing expenditures ... including those in other departments [than accounting] who are responsible for procuring services and approving invoices or other requests for payment." Id., ¶ 36.
Jardine also noted that adding new functional categories into a union's existing accounting system is a difficult and time-consuming process.[21]Id., ¶ 44. Based on her experience as a CPA, she concluded that:

any organization, whether or not it is a union, that decides to make modifications to its existing accounting system or replace its accounting system altogether, needs to spend considerable time researching and comparing the available options with respect to suitability and cost. Many of my clients who have undertaken such purchases have been able to do so only by consulting with outside experts in information technology and accounting. Moreover, migrating to an entirely new system requires months of preparation in order to ensure that the system functions properly and there is no loss of historical data. This implementation usually involves a substantial number of parallel test runs before the organization converts officially to the new or modified system. Similarly, making the transition to a modified system may take a substantial amount of time and preparation to ensure the proper functioning of the system.
Jardine Decl., ¶ 47 (emphasis in original).
Second, despite the fact that the Secretary imposed a January 1, 2004 effective date, the Department does not expect its electronic reporting software to be ready for distribution before March 31, 2004. See Def.'s Mot. for Recons./Clarification, at 4. The Jardine Declaration makes clear, however, that if a union discovers several months after the beginning of its fiscal year that it has not designed its query and report system correctly in light of the Department's electronic reporting software, that union may have to redesign and re-execute all of its queries and reports or to manually "cut and paste" information from its internal accounting reports into the LM-2 form at the end of the fiscal year. In either event, the options are "expensive, resource-intensive, and time-consuming." Jardine Decl., at ¶ 61.
Third, in choosing the January 1, 2004 effective date, the Secretary claimed no particular need for extraordinary urgency. While the rulemaking record, as already discussed, fully supports the Secretary's conclusion that "the advantages derived *128 from the more detailed reporting outweigh the extra burden imposed on unions," she has failed to explain how those unions that use a fiscal year beginning January 1 could possibly make such farreaching changes in less than two months, especially when these same regulations, with only minor modifications, have been in place for the last forty-three years. 68 Fed.Reg. at 58386.[22]
In sum, the rulemaking record demonstrates no reasonable justification for setting a January 1, 2004 effective date which, as a practical matter, requires unions that use a fiscal year beginning January 1 to make such far-reaching changes in less than two months. Consequently, the Secretary's imposition of the January 1, 2004 effective date is arbitrary and capricious and in violation of the APA.
The Court is persuaded, however, by the Government's Motion for Reconsideration/Clarification of the Preliminary Injunction, that the rulemaking record does not support an order enjoining the Rule's effective date for those unions that use a fiscal year beginning on or after July 1, provided that the Department makes available its electronic reporting software at least ninety days before that date.
In its Motion for Reconsideration/Clarification, the Government argues convincingly that there is no particularized showing of harm to those unions using a fiscal year that begins on or after July 1 caused by the Rule becoming effective July 1, provided that the Department makes available its electronic reporting software by March 31, 2004.[23] The Government also points out that "the Court's finding that a `two month transition period' is likely arbitrary and capricious ... does not, in any way, suggest that an eight or nine-month transition period, as available to those labor organizations whose fiscal year begins on July 1, is insufficient." Def.'s Mot. for Recons./Clarification, at 5 (citing to AFL-CIO v. Chao, No. 03cv2464 (GK), 2003 WL 23104826, December 31, 2003, Mem. Op., at 20-22). Notably, Plaintiff offers no meaningful rebuttal to the Government's arguments.
Thus, in light of the Government's Motion for Reconsideration/Clarification of the Preliminary Injunction, the Court concludes that the Department should be enjoined from imposing the Final Rule until July 1, 2004, or ninety days after the Department makes its electronic reporting software available, whichever is later.

IV. CONCLUSION
For the reasons stated, Plaintiff's request for permanent relief setting aside the Rule and enjoining its implementation is granted in part and denied in part.
NOTES
[1] The AFL-CIO is a federation of sixty-five national and international labor organizations with a total membership of approximately thirteen million workers. Plaintiff brings this action on its own behalf and on behalf of its member unions and their affiliated local unions. Compl. ¶ 5.
[2] The Paperwork Reduction Act dictates that final agency rules which require "information collection" are subject to review by the OMB. The OMB must approve or disapprove an information collection between thirty and sixty days after the publication of the Final Rule. See 5 C.F.R. § 1320.11(h). A proposed information collection is not enforceable until OMB has approved the rule or sixty days have passed without disapproval. See 5 C.F.R. § 1320.6.
[3] With the agreement of counsel, the Court consolidated Plaintiff's previously filed Motion for Preliminary Injunction with the merits of the case, pursuant to Fed.R.Civ.P. 65(a)(2).
[4] As a result of this modification, the Secretary anticipates that 501 fewer unions will have to file the Form LM-2. 68 Fed.Reg. at 58421.
[5] The Form T-1 requires a union to report on the finances of trusts "in which [the] union is interested," as defined in LMRDA § 3(1).
[6] A "functional" category is one that reflects the program or activity the expenditure ultimately supports. The five designated functional categories are (1) Representational Activities; (2) Political Activities and Lobbying; (3) Contributions, Gifts and Grants; (4) Union Administration and General Overhead; and (5) Benefits.
[7] The Department proposes to distribute its electronic reporting software by March 31, 2004. See Government's Mot. for Reconsideration, at 4.
[8] A "trust in which a union is interested" is defined in LMRDA § 3(1) as a

trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.
29 U.S.C. § 402(1).
[9] Pursuant to 26 U.S.C. § 527, a trust that qualifies as a "political organization" must file a financial report with the Internal Revenue Service.
[10] The purpose of the new audit alternative is to promote disclosure while avoiding duplication for trusts that are already subject to an independent audit. The audit option allows unions to avoid reporting the detailed financial information on a Form T-1 if they are already receiving an audit that meets the specifications set forth above, by simply filing a copy of such an audit along with the first page of the Form T-1, which provides identifying information.
[11] Even assuming that the statutory terms "financial condition" and "operations" are as limited as Plaintiff maintains, the plain language of § 201(b)(6) gives the Secretary the authority to go beyond the other information listed in § 201(b) and to require disclosures of "other disbursements," including the disbursements required under the Rule.
[12] Plaintiff claims that the annual report called for by the Taft-Hartley Act was "uniformly understood" to require a categorized summary of all of the organization's transactions, rather than a detailed itemization of ordinary transactions. Pl.'s Mot., at 17.
[13] Mallick I involved a union member who sought access to his union's books and records in order to ascertain the expenditures it had incurred in defending a separate lawsuit. The Court of Appeals held that the union had not violated the union member's rights to an equal vote and free speech under the LMRDA when it refused to release this material but remanded the case to the district court to determine whether the union member could make a just cause showing. Upon remand, the district court determined that he had, and granted plaintiff's motion for summary judgment and ordered that the union allow him to examine all relevant records. Mallick II affirmed the district court's decision.
[14] See the following cases cited with approval in Mallick I: Fruit & Vegetable Packers and Warehousemen Local 760 v. Morley, 378 F.2d 738, 744 (9th Cir.1967) (describing the "just cause" standard as "necessarily minimal"); Cumbea v. Local 400, Aluminum Workers' Int'l Union, 460 F.Supp. 60, 62 (E.D.Va.1978) (suggesting that a member who simply wanted further information about an unusual transaction reflected on the Form LM-2 satisfied the standard). See also Brennan v. Int'l Bhd. of Teamsters, AFL-CIO, 1997 WL 446259 *2 (D.D.C.) (recognizing the standard as "minimal," but noting that a union member still "must show more than `idle curiosity'") (citing Mallick I, 749 F.2d at 780-81.).
[15] 29 U.S.C. § 439 provides in full:

(a) Any person who willfully violates this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both; (b) Any person who makes a false statement or representation of a material fact, knowing it to be false, or who knowingly fails to disclose a material fact, in any document, report, or other information required under the provisions of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both; (c) Any person who willfully makes a false entry in or willfully conceals, withholds, or destroys any books, records, reports, or statements required to be kept by any provision of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both; (d) Each individual required to sign reports under sections 431 and 433 of this title shall be personally responsible for the filing of such reports and for any statement contained therein which he knows to be false.
29 U.S.C. § 439
[16] OLMS investigations of fraud and embezzlement over the past five years have resulted in over 640 criminal convictions. See 68 Fed. Reg. at 58420.
[17] The Secretary initially provided for a sixtyday comment period, but later extended that period for an additional thirty days. See 68 Fed.Reg. at 58374.
[18] The Secretary's 8.9 burden hour estimate is more than twice that of the Regulatory Studies Program of the Mercatus Center which "allocated one-half working day (i.e., four hours) for software installation" based on its expert opinion that "the software installation itself should be fairly rapid and uncomplicated." See Def.'s Opp'n, App. C, at 14. The Mercatus Center is an economic policy group based at George Mason University in Virginia that submitted detailed comments and data.
[19] The Department's current electronic filing system ("e.LORS") contains annual receipt data on all Form LM-2, LM-3, and LM-4 filers. See 68 Fed.Reg. at 58423.
[20] Specifically, Plaintiff claims that the Secretary underestimated (1) the cost and time involved in converting to an electronic filing system; (2) the cost of labor; and (3) the cost of capital equipment.
[21] For example, at a minimum, the unions "will have to develop concrete definitions of each functional category to ensure that expenditures are coded consistently." Jardine Decl., ¶ 36.
[22] Interestingly, in 1992, the Secretary adopted a financial reporting rule with some changes similar to those contained in the present Final Rule. In response to the comments submitted in that rulemaking, however, she concluded that the initially proposed two months' transition time was insufficient for the unions to modify their accounting systems, and thus postponed its effective date for one year. See 68 Fed.Reg. 58382.
[23] Significantly, when the Department developed e.LORS, its current electronic filing system, it asked several accounting firms to test the software before making it available to the unions. As a result of that series of tests, the Department made several adjustments to the system that allowed it to function better when it was finally distributed to the unions. See Jardine Decl., ¶ 62.